1  HAROLD J. MCELHINNY (CA SBN 66781)
   HMcElhinny@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California 94105-2482
   Telephone: 415.268.7000
4  Facsimile: 415.268.7522

5  KENNETH A. KUWAYTI (CA SBN 145384)
   KKuwayti@mofo.com
6  MARC DAVID PETERS (CA SBN 211725)
   MDPeters@mofo.com
7  MORRISON & FOERSTER LLP
   755 Page Mill Road
8  Palo Alto, CA 94304-1018
   Telephone: 650-813-5600
9  Facsimile: 650-494-0792

10 Attorneys for Defendants
   ADVANCED MICRO-FABRICATION EQUIPMENT, INC.
11 CHINA, ADVANCED MICRO-FABRICATION
   EQUIPMENT, INC. ASIA, and ADVANCED MICRO-
12 FABRICATION EQUIPMENT INC.

13

14                 UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

                      SAN JOSE DIVISION
16

17

18 | APPLIED MATERIALS, INC.,                | Case No.    C 07-05248 JW (PVT) |

   Plaintiff,

19                                            | **AMEC INC.'S REPLY BRIEF IN**
                                              | **SUPPORT OF ITS MOTION TO**
   v.                                         | **DISMISS APPLIED'S FIRST**
20                                            | **AMENDED COMPLAINT**

21 ADVANCED MICRO-FABRICATION
   EQUIPMENT, INC. CHINA, ADVANCED            Date:    February 25, 2008
22 MICRO-FABRICATION EQUIPMENT, INC.          Time:    9:00 a.m.
   ASIA, ADVANCED MICRO-FABRICATION           Ctrm:    8, 4th Floor
   EQUIPMENT INC.,
23
                      Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.   APPLIED CANNOT ESTABLISH JURISDICTION OVER AMEC INC. BASED ON THE ALTER EGO DOCTRINE ................................................................ 1

   A.  Applied Faces A High Burden In Establishing Alter Ego. ................................ 2

      1.  Applied Has Not Shown That There Is Such Unity Of Interest That The Separate Personalities Of AMEC Inc. And AMEC China or AMEC Asia Have Ceased To Exist. ................................................................................ 3

      2.  Applied Has Not Established That Failure To Disregard The Corporation's Separate Identities Would Result In Fraud or Injustice ................................. 6

   B.  Applied Should Not Be Granted Invasive Discovery Of Alter Ego Without First Making a Colorable Claim ................................................................... 6

II.  THE CASE SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS .................................................................................................... 7

   A.  China Is An Adequate Alternative Forum ........................................................ 8

   B.  Both The Convenience Of Material Witnesses And Accessibility Of Foreign Evidence Weigh Heavily In Favor Of A Chinese Forum. ............................... 10

      1.  The Bulk Of The Most Important Material Evidence In This Case Is In China. .......... 10

      2.  China Is A Much More Convenient Forum For Party And Non-Party Witnesses. ......... 12

   C.  The Center Of Public Interests In This Case Is In China. .................................. 13

      1.  The Chinese Courts Are Local To The Alleged Tort And Have Greater Interest In The Controversy. ........................................................................ 13

III. THE CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM .............. 15

1

**TABLE OF AUTHORITIES**

2

Page

3

**CASES**

4
American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,
   94 F.3d 586 (9th Cir. 1996)................................................................................5

5
Arno v. Club Med Inc.,
   22 F.3d 1464 (9th Cir. 1994)............................................................................14
6

Arsape v. JDS Uniphase,
7    No. C03-4535 JW, 2004 WL 2663180 (N.D. Cal. July 29, 2004)......................12

8
Beech Aircraft Corp. v. Sup. Ct.,
   61 Cal. App. 3d 501 (1976).............................................................................15
9

Britesmile, Inc. v. Discus Dental, Inc.,
   No. C 02-3220 JSW, 2005 U.S. Dist. LEXIS 37704 (N.D. Cal. May 5, 2005).....................2
10

11
City and County of San Francisco v. Philip Morris,
   No. C-96-2090 DLJ, 1998 U.S. Dist. LEXIS 3056 (N.D. Cal. Mar. 3, 1998).......................6
12

Contact Lumber Co. v. P.T. Moges Shipping Co.,
13    918 F.2d 1446 (9th Cir. 1990)..........................................................................14

Core-Vent Corp. v. Nobel Indus. AB,
14    11 F.3d 1482 (9th Cir. 1993)............................................................................14

15
Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.,
   61 F.3d 696 (9th Cir. 1995).............................................................................10
16
Deirmenjian v. Deutsche Bank, A.G.,
   No. CV 06-00774 MMM (CWx), 2006 WL 4749756 (C.D. Cal. Sept. 25,
17    2006) ...........................................................................................................9

18
Delta Brands, Inc. v. Danieli Corp.,
   No. 3:02-cv-0081-N, 2002 WL 31875560 (N.D. Tex. Dec. 20, 2002), aff'd, 99
19    Fed. Appx. 1 (5th Cir. 2004)......................................................................14, 15

Doe v. Unocal Corp.,
20    248 F.3d 915 (9th Cir. 2001)............................................................3, 4, 5, 6, 7

21
Dole Food Co. v. Watts,
   303 F.3d 1104 (9th Cir. 2002)............................................................................2
22

Fielding v. Hubert Burda Media, Inc.,
23    415 F.3d 419 (5th Cir. 2005)..............................................................................7

Gonzalez v. Walgreens Co.,
24    878 F.2d 560 (1st Cir. 1989)..............................................................................4

25
In re Compania Naviera Joanna S.A.,
   No. 2:07-CV-001531-DCN, 2007 WL 4801224 (D.S.C. Nov. 1, 2007) ...............10
26
In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,
   No. C 02-1486 PJH, 2005 WL 2988715 (N.D. Cal. Nov. 7, 2005) .....................6

27
In re Procter & Gamble Co.,
   334 F. Supp. 2d 1112 (E.D. Wis. 2004)...........................................................13
28
Kramer Motors, Inc. v. British Leyland, Ltd.,
   628 F.2d 1175, 1178 (9th Cir. 1980)..................................................................4

**TABLE OF AUTHORITIES**
(continued)

Page

*Lu v. Air China Int'l Corp.*,
No. CV 92-1254 (RR), 1992 WL 453646 (E.D.N.Y. Dec. 16, 1992) .................................. 8

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001).......................................................................... 10, 12, 13, 14

*Magnecomp Corp. v. Athene Co.*,
209 Cal. App. 3d 526 (1989)........................................................................................... 15

*Magnin v. Teledyne Cont'l Motors*,
91 F.3d 1424 (11th Cir. 1996).......................................................................................... 9

*Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*,
No. Civ.A. 03-3771, 2004 WL 503541 (E.D. Pa. Feb. 27, 2004), *vacated by*
436 F.3d 349 (3d Cir. 2006), *rev'd*, 127 S. Ct. 1184, 1194 (2007)........................................ 9

*Mesler v. Bragg Mgmt. Co.*,
39 Cal.3d 290 (1985) ...................................................................................................... 3

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981)............................................................................................. 9, 10, 15

*Sinochem Int'l Shipping Corp. v. Malaysia Int'l Shipping Corp.*,
127 S.Ct. 1184 (2007)................................................................................................. 1, 8

*Sonora Diamond Corp. v. Sup. Ct.*,
83 Cal. App. 4th 523 (2000) ......................................................................................... 2, 5

*Terracom v. Valley Nat'l Bank*,
49 F.3d 555 (9th Cir. 1995)............................................................................................. 6

*United States v. Bestfoods*,
524 U.S. 51, 61 (1998)................................................................................................... 3

*Von Grabe v. Sprint PCS*,
312 F. Supp. 2d 1285 (S.D. Cal. 2003) ........................................................................... 2, 4

*Waggoner v. Snow, Becker, Kroll, Klaris, & Krauss*,
991 F.2d 1501 (9th Cir. 1993)........................................................................................ 14

**INTRODUCTION**

Applied concedes that AMEC Inc.'s contacts with California do not support either general or specific jurisdiction. Applied instead argues an "alter ego" theory, which it did not plead and is not supported by the facts. Applied has not met the high burden required to show that the separate personalities of the companies have "ceased to exist." AMEC Inc. should be dismissed.

Because this case could be adjudicated adequately and more conveniently in the Chinese courts, the Court should dismiss it under the doctrine of *forum non conveniens*. In *Sinochem Int'l v. Malaysia Int'l*, the U.S. Supreme Court affirmed a "well reasoned" order transferring a case to China which found China to be an adequate forum. Applied's attacks on China as "inadequate" and "inconvenient" are as hollow as they are unsupported. Applied has been in China for ***twenty-two years***—and today has seven offices located across China. It derives more revenue from China and Southeast Asia than it does the United States. California is a significantly less convenient forum than China here. The most critical evidence and witnesses are in China, and because of export restrictions, any evidence Applied has in California can be more easily brought to China. The Court should dismiss this case in favor of a Chinese forum.

**ARGUMENT**

**I.   APPLIED CANNOT ESTABLISH JURISDICTION OVER AMEC INC. BASED ON THE ALTER EGO DOCTRINE**

Applied does not attempt to argue that AMEC Inc.'s contacts with California are sufficient to establish personal jurisdiction. Rather, Applied's sole argument for jurisdiction over AMEC Inc. is that it is "an alter ego of AMEC China and ***maybe*** AMEC Asia as well." (Opp. at 5, emphasis supplied).[1] As a threshold matter, however, Applied has yet to make a colorable claim of personal jurisdiction over either company, so an alter ego analysis is premature. But

---

[1] Applied's opposition mentions "agency theory" in passing, but its analysis is directed only to alter ego. (Opp. at 5.) The two doctrines are distinct, and to establish jurisdiction based upon agency, Applied would be required to make the difficult showing that the nature of the control exercised by the parent over the subsidiary is "over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." *Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal. App. 4th 523, 542 (2000). Applied has not even attempted to make such a showing here.

1  considering Applied's alter ego argument on its own terms, Applied falls far short of establishing

2  that AMEC Inc. is an alter ego of its subsidiaries.

3      Applied's alter ego theory is new to this case—it did not appear in Applied's First

4  Amended Complaint, and Applied has not pled any facts to support a theory of alter ego liability.

5  To the contrary, in its First Amended Complaint, Applied pled that AMEC Inc. "is a holding

6  company and the parent company to AMEC Shanghai and AMEC Asia." (FAC ¶14.) Matt

7  Ruby, Vice President and General Counsel of AMEC Inc., confirmed that AMEC Inc. is the

8  parent company of AMEC Asia. (Ruby Decl. (Doc # 55), ¶ 2.) Mr. Ruby also stated at the time

9  that AMEC China[2] is a cooperative joint venture, which is 80% owned by AMEC Asia and 20%

10  owned by Shanghai Venture Capital Co., Ltd. (*Id.* at ¶ 3.) A chart showing these relationships is

11  attached hereto as Exhibit A.

12      Since Applied has not pled any facts that would support alter ego liability, in order to

13  carry its burden and defeat AMEC Inc.'s motion to dismiss, Applied must set forth evidence in its

14  opposition (together with supporting declarations) sufficient to make a *prima facie* case of alter

15  ego. *Britesmile, Inc. v. Discus Dental, Inc.*, No. C 02-3220 JSW, 2005 U.S. Dist. LEXIS 37704,

16  *9-10 (N.D. Cal. May 5, 2005); *Von Grabe v. Sprint PCS,* 312 F. Supp. 2d 1285, 1297 (S.D. Cal.

17  2003) ("To establish a prima facie case, the plaintiff must produce admissible documentary

18  evidence containing facts sufficient to support a finding of personal jurisdiction.); *accord Dole*

19  *Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir. 2002). The standard for making a showing of

20  alter ego is high. Applied's opposition does not come close to meeting it.

21      **A.      Applied Faces A High Burden In Establishing Alter Ego.**

22      "Alter ego is an extreme remedy, sparingly used." *Sonora Diamond Corp. v. Sup. Ct.*, 83

23  Cal. App. 4th 523, 539 (2000). The basic rule is that the corporate form is, except in unusual

24  circumstances, ordinarily respected. "It is a general principle of corporate law deeply ingrained

25

26  [2] "AMEC China" is a Chinese company with a Chinese name; its official name in English is
   "Advanced Micro-Fabrication Equipment, Inc. China." It was sued by Applied under the name

27  "Advanced Micro-Fabrication Equipment (Shanghai) Co. Ltd." and Applied sometimes refers to
   it as "AMEC Shanghai." These names all refer to the same entity.

28

1  in our economic and legal systems that a parent corporation . . . is not liable for the acts of its

2  subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted).  Thus, "the

3  corporate form will be disregarded only in narrowly defined circumstances and only when the

4  ends of justice so require."  *Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 301 (1985).

5        To establish alter ego, Applied must show "(1) that there is such unity of interest and

6  ownership that the separate personalities of the two entities no longer exist and (2) that failure to

7  disregard their separate identities would result in fraud or injustice."  *Doe v. Unocal Corp.*,

8  248 F.3d 915, 926 (9th Cir. 2001).  Applied does not present evidence sufficient to demonstrate

9  the first prong; and Applied hasn't tried to establish the second prong of the analysis at all—that a

10  fraud or injustice would flow from recognizing AMEC China's or AMEC Asia's corporate forms.

11        AMEC Inc.'s only relationship to AMEC China is as an indirect investor, and its only

12  relationship to AMEC Asia is as a parent company.  (Ruby Decl., ¶¶ 2-3.)  There are no facts here

13  to support alter ego liability.

14    **1.    Applied Has Not Shown That There Is Such Unity Of Interest
              That The Separate Personalities Of AMEC Inc. And AMEC
15            China or AMEC Asia Have Ceased To Exist.**

16        A showing under the first prong of the alter ego analysis—that the separate personalities

17  of the corporations have ceased to exist—is difficult to make, as demonstrated by the many cases

18  refusing to find alter ego and pierce the corporate veil when faced with significantly more

19  evidence than Applied has set forth.

20        In *Kramer Motors, Inc. v. British Leyland, Ltd.*, for example, the Ninth Circuit affirmed

21  the dismissal of a foreign parent company for lack of personal jurisdiction, despite the fact that

22  the plaintiffs had established the following facts: (1) there were interlocking directors between the

23  parent and the subsidiary; (2) the parent was responsible for the sales of the subsidiary's products

24  in certain global markets; (3) the parent had general executive responsibility for the operation of

25  the subsidiary, and reviewed and approved its major policy decisions; (4) the parent guaranteed

26  obligations of the subsidiary to United States banks; and (5) United States residents could

27  purchase directly from the foreign parent.  Despite this evidence, the Court found that the "parent

28

1   and subsidiary have dealt with each other as distinct corporate entities." 628 F.2d 1175, 1178

2   (9th Cir. 1980).

3       In *Doe v. Unocal Corp.*, the Ninth Circuit similarly affirmed the dismissal of a parent

4   company for lack of personal jurisdiction. The Court reached this holding despite evidence

5   presented by the plaintiffs that: (1) the parent had provided numerous loans to its subsidiaries; (2)

6   the parent had referred to some of the subsidiaries as "divisions" of the parent corporation in its

7   annual report; (3) the parent was involved directly in decision-making about its subsidiaries'

8   holdings; (4) the subsidiaries were only adequately capitalized to maintain the holdings that they

9   already had and needed to seek approval and financing from the parent company to acquire new

10  holdings; and (5) there were several interlocking board members. *Doe*, 248 F.3d at 927-28.

11      Applied's speculative assertions here do not come close to the factual showing made by

12  the plaintiffs in *Kramer Motors* and *Doe*. Applied makes three arguments. First, Applied points

13  to AMEC Inc.'s website and a press release, where, among other things, AMEC Inc. refers to

14  products that are actually manufactured and developed by AMEC China as ***AMEC Inc.'s***

15  products. Applied claims that these statements show that "AMEC Inc. is, or is at least

16  indistinguishable from, the operational entity that defendants describe as AMEC China." (Opp. at

17  15.) The use of the AMEC name in advertising, however, is merely a choice regarding branding

18  using a trade name, and says nothing about the relationship between the parties. In *Von Grabe*,

19  for example, the plaintiff sought to establish jurisdiction over Sprint Corporation as an alter ego

20  of Sprint PCS through the use of a common trade name. 312 F. Supp. 2d at 1301. The court held

21  that, as in similar cases involving the use of a common trade name, the plaintiff's "subjective

22  interpretation and/or assumption or conclusion, without more, is not sufficient to establish

23  personal jurisdiction over Sprint Corporation." *Id.* Similarly, in *Gonzalez v. Walgreens Co.*, the

24  First Circuit held that the mere use of the name "Walgreens" was not enough to assert jurisdiction

25  over an out-of-state franchisor in a cause of action alleging the negligence of the franchisee. 878

26  F.2d 560, 561-62 (1st Cir. 1989).

27      Second, Applied relies on organizational charts of AMEC Inc. and AMEC China. From

28  these charts, Applied points to the titles of the various officers of AMEC Inc. as support for its

AMEC INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS APPLIED'S FAC
CASE NO. C07-05248 JW (PVT)
pa-1229390

4

1   theory that AMEC Inc. is more than a holding company, even though that is what it pled.  As an

2   example, Applied calls attention to the title of the Vice-President of <u>Global Business</u>.  (Opp. at 6.)

3   Applied contends that this type of title "reinforce[s] the ***impression*** that AMEC Inc. is an

4   operating company and not just a holding company."  (*Id.*, emphasis supplied.)  Mere titles of

5   officers, however, do not provide any information about the officers' specific responsibilities

6   within AMEC Inc., or whether they exert any control over AMEC China.

7          Applied also states that the organizational charts confirm that AMEC Inc. and AMEC

8   China are "more or less one and the same" because of the "virtual total overlap in management."

9   (Opp. at 15.)  However, there is not a total overlap (*see* Strapp Decl. (Doc. # 106), Ex. 9), and

10  even if there were, overlap of officers and directors between a parent and a subsidiary, without

11  more, does not establish alter ego.  "It is considered a normal attribute of ownership that officers

12  and directors of the parent serve as officers and directors of the subsidiary."  *Sonora Diamond*, 83

13  Cal. App. 4th at 548-49.  As the Ninth Circuit has held, the presence of interlocking officers and

14  directors alone is insufficient to rebut the presumption that "directors and officers holding

15  positions with a parent and its subsidiary can and do 'change hats' to represent the two

16  corporations separately, despite their common ownership."  *Doe*, 248 F.3d at 926.

17         Last, Applied attempts to allege that AMEC China and AMEC Asia are undercapitalized.

18  Applied's contention is sheer speculation.  Applied relies on a press release that refers to AMEC

19  Inc. thanking its investors for "the financial resources to develop and commercialize our

20  technology."  (Opp. at 16; Strapp Decl. Ex. 11.)  Applied reads this statement along with the fact

21  that AMEC Inc. has paid for some administrative costs where payment in dollars is required, as

22  creating the "logical inference" that the subsidiaries are not sufficiently capitalized.  (Opp. at 16.)

23  No such inference is created, and courts have rejected undercapitalization arguments when faced

24  with actual evidence far stronger than Applied's unsupported conjecture.  In *American Telephone*

25  *& Telegraph Co. v. Compagnie Bruxelles Lambert*, for example, the Ninth Circuit affirmed the

26  dismissal of the foreign parent company for lack of personal jurisdiction, despite evidence that the

27  subsidiary had, at one point, "zero working capital."  94 F.3d 586, 589 (9th Cir. 1996).  Indeed,

28  even where a company is insolvent—and there is no such contention here—that does not support

1  piercing the corporate veil: "Courts will find alter ego liability only where the subsidiary is so

2  undercapitalized from *the outset of incorporation* that it is unable to meet debts that may

3  reasonably arise in the course of business." *City and County of San Francisco v. Philip Morris*,

4  No. C-96-2090 DLJ, 1998 U.S. Dist. LEXIS 3056 at *27 (N.D. Cal. Mar. 3, 1998).

5
6            **2.    Applied Has Not Established That Failure To Disregard The
                     Corporation's Separate Identities Would Result In Fraud or
                     Injustice**

7  Applied has not even attempted to meet the second requirement of the alter ego doctrine,

8  that failure to disregard the separate existence of the corporations' separate identities would result

9  in fraud or injustice.  Here, too, Applied faces a high burden.  In *San Francisco v. Philip Morris*,

10  for example, the plaintiff alleged that the parent and subsidiary had conspired to shield damaging

11  documents from discovery by transferring them to the parent in anticipation of litigation, and that

12  the parent had deliberately forced the subsidiary into insolvency in order to frustrate the plaintiffs

13  litigation.  1998 U.S. Dist. LEXIS 3056 at *27.  Neither factor was sufficient to find alter ego.

14  Applied's failure to present any evidence to support the second requirement of the alter

15  ego doctrine defeats its alter ego claim.

16
17       **B.    Applied Should Not Be Granted Invasive Discovery Of Alter Ego
                 Without First Making a Colorable Claim**

18  Applied is required to make a colorable claim of alter ego before it is entitled to take

19  discovery on the issue—pleading is not enough.  *In re Dynamic Random Access Memory (DRAM)*

20  *Antitrust Litig.*, No. C 02-1486 PJH, 2005 WL 2988715, *9 (N.D. Cal. Nov. 7, 2005)

21  ("[J]urisdictional discovery is not to be had for the taking." (citing *Terracom v. Valley Nat'l Bank*,

22  49 F.3d 555, 562 (9th Cir. 1995)).

23  Since it has not made a proper factual showing on either alter ego or jurisdiction over

24  AMEC Inc.'s subsidiaries, the law is clear that Applied is not entitled to alter ego discovery.  In

25  *Doe v. Unocal*, the Ninth Circuit affirmed the district court and held that the plaintiffs had "not

26  met their burden of showing that the defendant's subsidiaries with substantial California contacts

27  should be treated as its general agents for jurisdictional purposes."  248 F.3d at 930.  The court

28  also affirmed the district court's denial of additional discovery on the issue of specific

1   jurisdiction, because the plaintiff could not make out a *prima facie* case.  *Id.* at 924.  The Fifth

2   Circuit reached a similar result in *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th

3   Cir. 2005) (sustaining district court's denial of discovery into the relationship between a parent

4   and its subsidiary because the plaintiff could not establish personal jurisdiction over the

5   subsidiary).  In many ways, alter ego discovery is much more intrusive than other forms of

6   discovery, particularly among competitors.  For example, Applied requests "All documents

7   reflecting the finances and capitalization of AMEC Shanghai, AMEC Inc. and/or AMEC Asia,

8   including but not limited to, budgets, revenue forecasts, business plans, financial projections,

9   2007 bank statements, loan agreements, letters of credit, and guaranty agreements."  (Strapp Decl.

10  ¶3, Ex. 1 at 8.)  Loan agreements and letters of credit have nothing to do with any fact or cause of

11  action pled in the amended complaint, and the potential for misuse of that information is great.

12  Applied should not be allowed to conduct a fishing expedition for sensitive business information

13  when it has failed to present or even plead any facts to support alter ego liability.  There is no

14  need for discovery.[3]  AMEC Inc. should be promptly dismissed from the case.

15  **II.    THE CASE SHOULD BE DISMISSED ON *FORUM NON***
        ***CONVENIENS* GROUNDS**
16
17          Applied Materials is truly a global company.  It calls itself the "first semiconductor

18  equipment company in China"—having been in China for ***twenty-two years***—and today has

19  seven offices located across China.  (Declaration of Kenneth Kuwayti in Support of AMEC Inc.'s

20  and AMEC China's Motions To Dismiss Applied's FAC ("Kuwayti Decl."), Exs. A & B.)

21  Applied derives more revenue from China and Southeast Asia than it does the United States.  (*Id.*,

22  Ex. A.)  Applied's CEO  recently stated that Applied Materials will weather the "major

23  slowdown" in the U.S. economy because "most of its sales come from outside North America,

24  helping the company to benefit from the decline in the U.S. dollar."  (*Id.*, Ex. C.)  A company to

25  which Asia in general, and China in particular, are so important cannot claim that a Chinese

26  forum is "inadequate" and "inconvenient."

27  ─────────────────
    [3] While Applied complains about a lack of discovery (Opp. at 16), the parties' dispute pertains
    exclusively to alter ego discovery, not California contacts.  *See* Kuwayti Decl. at ¶ 11.

28

1    This dispute between the "first" semiconductor equipment company in China and one of

2    the newest should be adjudicated in China—the place where Applied alleges the wrongful

3    conduct occurred.  (FAC ¶¶ 5, 8, 38, 40, 42-43.)  Applied cannot reasonably expect that it can

4    litigate every case in California just because its headquarters is here, which is what it is really

5    arguing.  Applied's arguments make even less sense, considering it has offices and sales around

6    the world.  Applied has found Chinese law adequate for its own purposes for years.  The Court

7    should invite Applied to bring its claim in China and dismiss this case.

8         A.    **China Is An Adequate Alternative Forum**

9         The Supreme Court finds no fault with the Chinese courts, having recently upheld a

10   district court's "well-considered" *forum non conveniens* dismissal, where the court had found that

11   "the case could be adjudicated adequately and more conveniently in the Chinese courts."

12   *Sinochem Int'l Shipping Corp. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1186 (2007).

13        Applied has offered no ***evidence*** that China would be an inadequate forum.  AMEC Inc.

14   submitted the declaration of Huaiyu Xu, an attorney licensed in the People's Republic of China,

15   to show that China's law provides causes of action that are essentially the same as those Applied

16   filed here.[4]  *See* Declaration of Huaiyu Xu in Support of AMEC Inc. Motion To Dismiss (Doc. #

17   56) ("Xu Decl.") ¶¶ 6-18.  Mr. Xu also explained that the Chinese courts provide nationwide

18   compulsory production of documents and testimony, that Applied would have the right to present

19   evidence and witnesses and to cross-examine AMEC's witnesses, and that Applied would have

20   the right to appeal any adverse decision at trial.  *Id.*  Such a declaration establishes that the

21   Chinese forum is available and adequate.  *Lu v. Air China Int'l Corp.*, No. CV 92-1254 (RR),

22   1992 WL 453646, at *2 (E.D.N.Y. Dec. 16, 1992).

23        AMEC's evidence has not been contradicted by Applied, which is fatal to its opposition.

24   *Id.* ("[D]ue regard for international comity suggests that courts should not label the proceedings

25

26   _____
     [4] Mr. Xu also declared that Chinese law provided for the return of property to its rightful owner
27   and a Chinese court would hear disputes over patent application rights and patent ownership.  (Xu
     Decl. at ¶ 8.)  Thus, Applied's suggestion that AMEC did not address the availability of
28   injunctive relief (Opp. at 20) is mistaken.

1    of a foreign tribunal 'clearly unsatisfactory' absent some basis for such a conclusion."). Despite

2    the fact that Applied had Mr. Xu's declaration for more than two months, it offers no declaration

3    of its own to disprove that Chinese law would provide Applied with remedies for its alleged

4    injuries. All Applied offers is a law review article (Opp. at 21), which is not sufficient.[5]

5           None of Applied's unsupported arguments is sufficient to overcome AMEC's showing.

6    Lack of trial by jury does not make a foreign forum inadequate. As the Eleventh Circuit held

7    when affirming a dismissal for *forum non conveniens*:

8           "jury trials are almost always available in the United States, while they are never
            provided in civil law jurisdictions," and "[e]ven in the United Kingdom, most civil
9           actions are not tried by a jury." Yet, there are numerous decisions dismissing cases
            in favor of a civil law jurisdiction forum, and in favor of the United Kingdom as a
10          forum.

11   *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430 (11th Cir. 1996) (quoting *Piper Aircraft*

12   *Co. v. Reyno*, 454 U.S. 235, 252 n.18 (1981)).

13          Different approaches to pre-trial discovery—even the complete absence of discovery—do

14   not make a foreign forum inadequate. *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774

15   MMM (CWx), 2006 WL 4749756, at *10 (C.D. Cal. Sept. 25, 2006). The Chinese system of pre-

16   trial discovery may not be as comprehensive or as broad as that provided by an American court,

17   but there is "no reason to doubt the competence and justness of the system the Chinese courts do

18   have in place." *Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, No. Civ.A. 03-3771, 2004

19   WL 503541, at *10 (E.D. Pa. Feb. 27, 2004), *vacated by* 436 F.3d 349 (3d Cir. 2006), *rev'd*, 127

20   S. Ct. 1184, 1194 (2007).

21          That a Chinese court may apply Chinese law (Opp. at 20), instead of California law, is not

22   relevant to the adequacy of the forum. "The *forum non conveniens* doctrine does not guarantee

23   _____

24   [5] In fact, more recent scholarship suggests that the legislative and administrative reforms spurred
     on by China's entry into the World Trade Organization and "the transparency and anti-corruption
25   reforms in the practice and procedure of the People's Court . . . have worked to give law
     enforcement in general, and intellectual property in particular, new meanings and hence new
26   challenges, quite unimaginable in the 1990s." Peter K. Yu, *From Pirates to Partners (Episode
     II): Protecting Intellectual Property in Post-WTO China*, 55 Am. U.L. Rev. 901, 923 (2006); *see
27   also* Mei Ying Gechlik, *Judicial Reform in China: Lessons from Shanghai*, 19 COLUM. J. ASIAN
     L. 97, 137 (2005) (describing judicial reform in China and noting "particularly impressive" results
     in Shanghai).

28

1   the plaintiff its choice of law, or even that United States law will be applied in the alternative

2   forum." *Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 701 (9th Cir. 1995).  Courts

3   will dismiss on *forum non conveniens* grounds even when a Chinese statute of limitations has run.

4   *In re Compania Naviera Joanna S.A.*, No. 2:07-CV-001531-DCN, 2007 WL 4801224, *5-6

5   (D.S.C. Nov. 1, 2007).

6         In the end, all Applied does is use charged language ("ominous", "inquisitorial", and

7   "Communist") to hint that it will not get a fair trial in China (Opp. at 21), but the truth is that

8   Applied is beloved in China, and in Shanghai particularly.  In 2004, Applied's chairman Jim

9   Morgan was named an "Honorary Citizen of Shanghai," the highest award bestowed upon foreign

10   civic and business leaders for contributions that have made a lasting impact on Shanghai and

11   China.  (Kuwayti Decl., Ex. D.)  As Applied's CEO Mike Splinter put it, "[Applied's] long-

12   standing commitment to China has been a key part of our success as the country has established

13   its place among the major chipmaking regions of the world."  *Id.*

14         AMEC has established that the present case can be filed in China and that, if successful,

15   Applied would receive compensation and injunctive relief.  Applied has not offered any evidence

16   that this remedy is inadequate, let alone show that Chinese litigation it is so inadequate that it is

17   tantamount to no remedy at all.  *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144-45 (9th Cir.

18   2001).  Accordingly, AMEC has demonstrated that an adequate alternative forum is available.

19       **B.**     **Both The Convenience Of Material Witnesses And Accessibility Of**

20                **Foreign Evidence Weigh Heavily In Favor Of A Chinese Forum.**

21         There are significant barriers to litigating this case in the United States.  These barriers

22   would not be present if the case were litigated in China.  Because the "central focus of the *forum*

23   *non conveniens* inquiry is convenience," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981),

24   the case should be dismissed, leaving Applied free to refile its suit in China.

25        **1.**     **The Bulk Of The Most Important Material Evidence In This**
                **Case Is In China.**

26         With respect to physical and documentary evidence, although there is no doubt that there

27   is some in California, Applied cannot seriously argue that the bulk of the critical physical and

28   documentary evidence in this case is anywhere but China.  The fundamental issue in this case is

1    whether AMEC is or is not using Applied trade secrets in connection with its products.  The

2    evidence regarding that issue is in China—where the products are developed, built, and will be

3    sold.  As AMEC's declarations establish, none of that activity takes place in the United States.

4    But the issue is not the quantity of documents located at one place or another—the issue is

5    whether AMEC's information, which is necessary to this case, can be brought to the United

6    States.

7            The mechanisms for exporting Applied's documents and information from the U.S. to

8    China are already in place.  Applied , with vastly more resources than AMEC, regularly sells its

9    equipment to China, has a variety of offices and subsidiaries in China, and maintains a Corporate

10   Export Compliance Department to ensure that Applied complies with the laws and regulations

11   "pertaining to the export and/or re-export of products, spare parts, accessories, training materials

12   and technical data."  (Kuwayti Decl., Ex. E, at 12.)  Applied Materials China, and in particular its

13   facility in Shanghai, recently applied for and was granted Validated End-User status by the

14   Bureau of Industry and Security of the Department of Commerce, which removed certain

15   individual license requirements for export from the U.S.  (Kuwayti Decl., Ex. F.)

16          In marked contrast, exporting AMEC China's most sensitive technical information—

17   which Applied has demanded be produced to it—from China to the U.S. presents many

18   challenges.  China regulates the export of advanced technologies, just as the United States does.

19   Export of "sensitive" technology is governed by the Law on Guarding State Secrets

20   (中华人民共和国保守国家秘密法), Regulations on Guarding Science and Technology Secrets

21   (科学技术保密规定), Measures for the Administration of Technologies Prohibited or Restricted

22   from Export (禁止出口限制出口技术管理办法), and the Regulations on the Administration of

23   Import and Export of Technologies (中华人民共和国技术进出口管理条例), among others.

24   Navigating these laws will prove to be a challenge, if Applied's substantial and continuing effort

25   to comply with their U.S. counterparts is any guide.  Unfortunately, because AMEC China had

26   (and still has) no plans to export its products to the United States, it has not already obtained

27   export licenses for export to the U.S., so the process of discovery in this case will be a challenge.

28

1    For these reasons, litigation in China is vastly more convenient and much less expensive

2    than litigation in the United States.  As the Ninth Circuit pointed out, under these circumstances,

3    "the private interest factors are not in equipoise" and dismissal is appropriate.  *Lueck*, 236 F.3d at

4    1146 ("The documents and witnesses in the United States are all under the control of Plaintiffs

5    and Defendants, so they can be brought to court, no matter the forum.  The documents and

6    witnesses in New Zealand, however, are not so easily summoned to the United States.").

### 2.    China Is A Much More Convenient Forum For Party And Non-Party Witnesses.

8    The same analysis applies to the witnesses who are involved in this case.  The gravamen

9    of Applied's complaint is that its ex-employees are using its alleged trade secrets in their new

10   jobs for the AMEC entities in China.  And indeed, Applied's Initial Disclosure identifies more

11   than *twenty* AMEC people who may have "knowledge relating to the trade secrets that Applied

12   alleges Defendants have misappropriated and to the particular circumstances surrounding

13   Defendant's misappropriation of those trade secrets."[6]  (Kuwayti Decl., ¶ 8 & Ex. G.)  It is simply

14   not credible for Applied to argue (as it does on page 22 of its opposition) that AMEC Inc.'s

15   *investors* (including Goldman Sachs) are "more likely to be significant" than the ***AMEC China***

16   ***engineers it accuses of theft***.

17   That so many witnesses resident in China are central to the question of liability is a

18   serious inconvenience in this case.  *Arsape v. JDS Uniphase*, No. C03-4535 JW, 2004 WL

19   2663180, *6 (N.D. Cal. July 29, 2004).  The Chinese witnesses will be required to travel far from

20   home for their deposition to be taken, because China regards the taking of American depositions

21   in China to violate its judicial sovereignty, leading to the arrest, detention, expulsion, or

22   deportation of the participants. *See* http://travel.state.gov/law/info/judicial/judicial_694.html.

23   Third, the third-party customers and potential customers at issue in this case are mostly in China,

24   and all in Asia.  (*See* Declaration of Marc Peters In Support Of AMEC Inc.'s Motion To Dismiss

---

[6] These people are mostly AMEC China employees, resident in China—the AMEC entities have
established that they have no facilities in California.  Ruby Decl. (Doc. # 55), ¶ 6; Declaration of
Aihua Chen in Support of AMEC Asia's Motion To Dismiss (Doc. # 102), ¶ 4;  Declaration of
Zhiyou Du in Support of AMEC China's Motion To Dismiss (Doc. # 99), ¶ 5.

1    (Doc. # 57), ¶ 2-6 & Exs. A-E; Ruby Decl. (Doc. # 55), ¶ 6.)  These parties will find it much less

2    burdensome, for example, to fly from Taiwan to Shanghai rather than to San Francisco.

3    Discovery will be more expensive if this suit proceeds in California.

4            These factors weigh strongly in favor of dismissal.  The Ninth Circuit holds that "a court's

5    focus should not rest on the number of witnesses or quantity of evidence in each locale. Rather, a

6    court should evaluate the materiality and importance of the anticipated evidence and witnesses'

7    testimony and then determine their accessibility and convenience to the forum."  *Lueck*, 236 F.3d

8    at 1146 (quotations omitted).

9            Using this yardstick, China offers a much more attractive and convenient forum than does

10   California.  China offers nationwide compulsory process and will accept testimony obtained

11   through depositions abroad. (Xu Decl. ¶¶ 15-16.)  U.S. law does not forbid such depositions from

12   taking place—to the contrary, it expressly gives parties access to U.S. discovery procedures to

13   obtain evidence for foreign legal proceedings.  28 U.S.C. § 1782; *see In re Procter & Gamble*

14   *Co.*, 334 F. Supp. 2d 1112, 1113 (E.D. Wis. 2004).  So if there is any third-party discovery that

15   Applied needs to obtain in the U.S., it will be able to do so.  Travel expenses alone will be

16   significantly less in a Chinese forum.  Applied has extensive infrastructure in China—it has three

17   locations in Shanghai—and will readily be able litigate its claims there.  (Kuwayti Decl., Ex. B.)

18   The private factors decisively weigh in favor of a Chinese forum.

19       **C.    The Center Of Public Interests In This Case Is In China.**

20           **1.    The Chinese Courts Are Local To The Alleged Tort And Have**
                     **Greater Interest In The Controversy.**

21

22           Applied alleges that the misappropriation took place in China.  (FAC ¶¶ 5, 8, 38, 40, 42-

23   43.)  It naturally follows that the Chinese courts are the undeniable *local* court to this controversy:

24   the conduct that Applied complains of occurred on Chinese soil, was allegedly perpetrated by a

25   Chinese company, and the act allegedly giving rise to the conversion claim was the filing of

26   Chinese patent applications.

27           In a case parallel to this one, a district court dismissed a trade secret case on *forum non*

28   *conveniens* grounds, holding that the foreign location of the misappropriation "heavily favors"

---

AMEC INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS APPLIED'S FAC
CASE NO. C07-05248 JW (PVT)
pa-1229390

13

1    dismissing the action.  *Delta Brands, Inc. v. Danieli Corp.*, No. 3:02-cv-0081-N, 2002 WL

2    31875560, *9 (N.D. Tex. Dec. 20, 2002), *aff'd*, 99 Fed. Appx. 1, 5 (5th Cir. 2004) (Where the

3    alleged misappropriation happened in Italy but the plaintiff was in Texas, the district court held

4    that although "Texas does have an interest in providing a forum" for Texas litigants, "this interest

5    is small when compared with Italy's interest in regulating companies that conduct business within

6    its boundaries.").  The court also held that the domestic interest was minimized because a large

7    portion of the plaintiff's sales were outside of the United States—just as Applied's are.  *Id.* at *9

8    n.4.

9          It defies common sense to say that China's interest is inferior to California's.  Although it

10   is true that California has an interest in providing effective redress to its residents who are

11   tortiously injured, *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993), the

12   Ninth Circuit has questioned the legitimacy of this interest:

13         It's not entirely clear why a state has a legitimate interest in having one of its
           residents collect money from the resident of another jurisdiction based on conduct
14         that occurred outside the state's boundaries. When adjudicating disputes, after all,
           the state may not legitimately favor a party just because that party lives within its
15         borders.

16   *Arno v. Club Med Inc.*, 22 F.3d 1464, 1468 n.5 (9th Cir. 1994); *see also Waggoner v. Snow,*

17   *Becker, Kroll, Klaris, & Krauss*, 991 F.2d 1501, 1507 (9th Cir. 1993) (finding California's

18   interests are "weak" where none of the conduct occurred in California).  But whatever

19   California's interest in this controversy, it does not preclude the Court from requiring Applied to

20   litigate its claims in China.  *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446,

21   1452 (9th Cir. 1990) (granting *forum non conveniens* dismissal in favor of Philippines even

22   though there was a "profound" California interest).  Moreover, Applied is not really a California

23   company—it is a ***global*** company.  Courts lessen the deference they give to a plaintiff's choice of

24   forum when the plaintiff is an American company that engages in international business.  *Delta*

25   *Brands*, 2002 WL 31875560, *7.

26         The Court need not address the choice-of-law factor, as Applied admits.  (Opp. at 24.)

27   Indeed, the "applicability of United States law to the various causes of action should ordinarily

28   not be given conclusive or even substantive weight."  *Lueck*, 236 F.3d at 1148 (citations omitted).

1   The Court may well choose to dismiss this case to avoid having to "untangle problems in conflict

2   of laws, and in law foreign to itself."  *Piper*, 454 U.S. at 251.

3           But there are two points to make in reply to Applied's argument.  First, given that the

4   complained-of acts occurred in China, that the main defendant is a Chinese corporation, and that

5   Applied is trying to obtain an assignment of Chinese patent applications, it is likely that Chinese

6   law will apply to at least some of Applied's claims under California's conflict of law analysis.

7   *Beech Aircraft Corp. v. Sup. Ct.*, 61 Cal. App. 3d 501, 518 (1976).  Second, Applied misstates the

8   holding of *Magnecomp*, its sole case on this subject.  The key point of *Magnecomp* was that the

9   alleged trade secret misappropriation was initiated and carried out "within California."

10  *Magnecomp Corp. v. Athene Co.*, 209 Cal. App. 3d 526, 535 (1989).  That is the same point made

11  in *Delta Brands*, 2002 WL 31875560, *7 (alleged misappropriation occurred in Italy), and the

12  same point we make here: Applied complains that AMEC is using its secrets in China and

13  disclosed its secrets through the Chinese patent office.  So the Court should send this case to

14  China, where it belongs.

15  **III.    THE CASE SHOULD BE DISMISSED FOR FAILURE TO STATE
          A CLAIM**

16
           AMEC Inc. joins AMEC China's motion to dismiss for failure to state a claim and

17  preemption.  The California Uniform Trade Secrets Act does not apply to extraterritorial conduct

18  and preempts Applied's other claims, which are based on allegations of trade secret

19  misappropriation.  The arguments made by AMEC China apply with equal force to AMEC Inc.

20  The Court should dismiss the action.

21

22  Dated: February 11, 2008                   HAROLD J. MCELHINNY
                                               KENNETH A. KUWAYTI
23                                             MARC DAVID PETERS
                                               MORRISON & FOERSTER LLP
24
                                               By:    /s/ Marc David Peters
25                                                    Marc David Peters

26                                             Attorneys for Defendant AMEC Inc.

27

28

AMEC INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS APPLIED'S FAC
CASE NO. C07-05248 JW (PVT)
pa-1229390

15

1

# EXHIBIT A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28