1   HAROLD J. MCELHINNY (CA SBN 66781)
    HMcElhinny@mofo.com
2   MORRISON & FOERSTER LLP
    425 Market Street
3   San Francisco, California  94105-2482
    Telephone: 415.268.7000
4   Facsimile: 415.268.7522

5   KENNETH A. KUWAYTI (CA SBN 145384)
    KKuwayti@mofo.com
6   MARC DAVID PETERS (CA SBN 211725)
    MDPeters@mofo.com
7   MORRISON & FOERSTER LLP
    755 Page Mill Road
8   Palo Alto, CA 94304-1018
    Telephone:  650-813-5600
9   Facsimile:  650-494-0792

10  Attorneys for Defendants
    ADVANCED MICRO-FABRICATION EQUIPMENT, INC.
11  CHINA, ADVANCED MICRO-FABRICATION
    EQUIPMENT, INC. ASIA, and ADVANCED MICRO-
12  FABRICATION EQUIPMENT INC.

13                     UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                           SAN JOSE DIVISION

16

17

18  APPLIED MATERIALS, INC.,              Case No.    C 07-05248 JW (PVT)

                    Plaintiff,            **AMEC CHINA'S REPLY BRIEF**
19                                        **IN SUPPORT OF ITS MOTION**
                                          **TO DISMISS APPLIED'S FIRST**
20          v.                            **AMENDED COMPLAINT**

    ADVANCED MICRO-FABRICATION
21  EQUIPMENT, INC. CHINA, ADVANCED       Date:    February 25, 2008
    MICRO-FABRICATION EQUIPMENT, INC.     Time:    9:00 a.m.
22  ASIA, ADVANCED MICRO-FABRICATION      Ctrm:    8, 4th Floor
    EQUIPMENT INC.,
23
                    Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

I.   APPLIED HAS NOT ESTABLISHED THAT THIS COURT HAS
     PERSONAL JURISDICTION OVER AMEC CHINA ......................................................... 1

   A.  Applied Must Point to Admissible Evidence and Well-Pled Allegations to
       Meet its Burden. ................................................................................................. 2

   B.  Applied's Claims Do Not Arise out of AMEC China's Minimal Contacts
       with California. ................................................................................................. 2

   C.  Applied Cannot Establish AMEC China Purposefully Directed Any
       Relevant Activities Toward California .............................................................. 2

   D.  Exercise of Jurisdiction Here Would be Unreasonable.................................... 10

II.  CONDUCT IN CHINA DOES NOT ESTABLISH A CAUSE OF ACTION
     UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT ................................. 10

III. APPLIED'S SECOND, THIRD AND FOURTH CAUSES OF ACTION
     ARE PREEMPTED ....................................................................................................... 12

IV.  THE CASE SHOULD BE DISMISSED ON *FORUM NON CONVENIENS*
     GROUNDS ................................................................................................................... 15

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*AirDefense, Inc. v. AirTight Networks, Inc.*,
   No. C 05-04615 JF, 2006 WL 2092053 (N. D. Cal. July 26, 2006) ....................................14

5

6

*Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*,
   439 F.2d 428 (2d Cir. 1971).............................................................................................3

7

*Amazon.com, Inc. v. Kalayjian*,
   2001 U.S. Dist. LEXIS 4924 (W.D. Wash. Feb. 20, 2001) ...................................................3

8

*Arch Aluminum & Glass Co. v. Haney*,
   964 So. 2d 228 (Fla. Dist. Ct. App. 2007) .......................................................................6, 7

9

*Bancroft & Masters, Inc., v. Augusta Nat'l Inc.*,
   223 F.3d 1082 (9th Cir. 2000)........................................................................................5, 6

10

11

*Brainerd v. Governors of the Univ. of Alberta*,
   873 F.2d 1257 (9th Cir. 1989).............................................................................................5

12

*Calderv. Jones*,
   465 U.S. 783 (1984).........................................................................................................5

13

*Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc.*,
   318 F. Supp. 2d 216 (D. Del. 2004) ..............................................................................13, 14

14

*Casualty Assurance Risk Insurance Brokerage Co. v. Dillon*,
   976 F.2d 596 (9th Cir. 1992).............................................................................................3

15

16

*CE Distribution, LLC v. New Sensor Corp.*,
   380 F.3d 1107 (9th Cir. 2004).............................................................................................5

17

*Chaplin v. Greyhound Lines, Inc.*,
   No. C-94-3799 MHP, 1995 WL 419741 (N.D. Cal. July 3, 1995)................................11, 12

18

*China Tech. Global Corp. v. Fuller, Tubb, Pomeroy & Stokes*,
   No. C 05-01793 JW, 2005 WL 1513153 (N.D. Cal. June 27, 2005)....................................2

19

*Convolve, Inc. v. Compaq Computer Corp.*,
   No. 00cv5141(GBD), 2006 U.S. Dist. LEXIS 13848 (S.D.N.Y. Mar. 29, 2006)................13

20

*Core-Vent Corp. v. Nobel Indus. AB*,
   11 F.3d 1482 (9th Cir. 1993)...........................................................................................10

21

*CyberSell, Inc. v. Cybersell, Inc.*,
   130 F.3d 414 (9th Cir. 1997).............................................................................................4

22

*Diamond Multimedia Sys., Inc. v. Sup. Ct.*,
   19 Cal. 4th 1036 (1999) ............................................................................................10, 11

23

*Digital Envoy, Inc. v. Google, Inc.*,
   370 F. Supp. 2d 1025 (N.D. Cal. 2005) .........................................................................13, 15

24

*Diodes, Inc. v. Franzen*,
   260 Cal. App. 2d 244 (1968).............................................................................................8

25

26

*Directory Dividends, Inc. v. SBC Commc'ns, Inc.*,
   No. 01-CV-1974, 2003 U.S. Dist. LEXIS 19560 (E.D. Pa. Oct. 23, 2003)..........................4

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ............................................................................... 2

*Drayton Enterprises, L.L.C. v. Dunker*,
  142 F. Supp. 2d 1177 (D.N.D. 2001) .............................................................. 4, 9

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*,
  No. 04cv2562 JM (CAB), 2007 US Dist. LEXIS 60885 (S.D. Cal. Aug. 20,
  2007) ................................................................................................................. 15

*ESAB Group, Inc. v. Centricut, Inc.*,
  126 F.3d 617 (4th Cir. 1997) ........................................................................... 3, 4

*Facebook, Inc. v. ConnectU LLC*,
  No. C07-01389 RS, 2007 U.S. Dist. LEXIS 61962 (N.D. Cal. Aug. 13, 2007) ................... 6

*FMC Corp. v. Varco Int'l, Inc.*,
  677 F.2d 500 (5th Cir. 1982) ................................................................................ 5

*General Steel Domestic Sales, LLC v. Suthers*,
  No. Civ. 2-06-411 LKK/KJM, 2007 U.S. Dist. LEXIS 19231 (E.D. Cal. Mar.
  2, 2007) ................................................................................................................ 4

*Guang Dong Light Headgear Factory Co., Ltd. v. ACI Int'l, Inc.*,
  No. 03-4165-JAR, 2007 U.S. Dist. LEXIS 33497 (D. Kan. May 4, 2007) ................... 5

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
  328 F.3d 1122 (9th Cir. 2003) .............................................................................. 5

*Lake v. Lake*,
  817 F.2d 1416 (9th Cir. 1987) .............................................................................. 2

*N. Alaska Salmon Co. v. A.J. Pillsbury*,
  174 Cal. 1 (1916) .................................................................................... 10, 11, 12

*Norwest Mortgage, Inc. v. Sup. Ct.*,
  72 Cal. App. 4th 214 (1999) ............................................................................... 12

*Nucor Corp. v. Bell*,
  482 F. Supp. 2d 714 (D. S.C. 2007) ................................................................ 9, 10

*Panavision Int'l L.P. v. Toeppen*,
  141 F.3d 1316 (9th Cir. 1998) .............................................................................. 6

*Pavlovich v. Sup. Ct.*,
  29 Cal. 4th 262 (2002) .......................................................................................... 6

*Portrait Displays, Inc. v. Speece*,
  No. C-04-1501 RMW, 2004 U.S. Dist. LEXIS 18595 (N.D. Cal. Sept. 3, 2004) ................ 6

*PostX Corp. v. Secure Data in Motion, Inc.*,
  No. C02-04483 SI, 2004 U.S. Dist. LEXIS 24260 (N.D. Cal. Nov. 20, 2004) ................... 15

*Sarkes Tarzian, Inc. v. Audio Devices, Inc.*,
  166 F. Supp. 250 (C.D. Cal. 1958) ...................................................................... 7

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ................................................................... 1, 2, 3, 5

1

### TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Speyer v. Avis Rent A Car System, Inc.*,
    415 F. Supp. 2d 1090 (S.D. Cal. 2005) .................................................................12

4

*Thermal Components Co v. Griffith*,
    98 F. Supp. 2d 1224 (D. Kan. 2000) .......................................................................5

5

*Wenz v. Memery Crystal*,
    55 F.3d 1503 (10th Cir. 1995).................................................................................2

6

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006).................................................................................6

7

### STATUTES

8

Cal. Bus. & Prof. Code § 16600 ...................................................................................8

9

Cal. Civ. Code § 3426.7 ..............................................................................................13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

AMEC China's contacts with California are minimal, and Applied does not argue that the Court has general jurisdiction here. Applied has not established specific jurisdiction either, because it has not shown that its claims arise out of AMEC China's California contacts, or that AMEC China purposefully directed its activities towards California. If any tort occurred, it took place in China, and AMEC China cannot be said to have "expressly aimed" its conduct at California when it makes no California sales and Applied is a global company whose sales in Asia exceed those in the United States. If there was any express aiming at all, it was at Asia, not California. Applied's argument that there is jurisdiction because it is headquartered in California and developed its intellectual property here has consistently been rejected by the courts.

In an attempt to save its jurisdictional argument, Applied focuses primarily on the issue of employee solicitation. But Applied has not submitted any evidence to support its claim, and the allegations in the complaint are conclusory at best. Moreover, Applied has not cited to a single case finding that lawful solicitation would support jurisdiction over the claims at issue here.

To the extent there is jurisdiction, Applied has no claim under California's UTSA because all of the alleged misappropriation took place outside of California. And its three remaining causes of action are preempted because they are based on misappropriation of trade secrets.

**I.    APPLIED HAS NOT ESTABLISHED THAT THIS COURT HAS PERSONAL JURISDICTION OVER AMEC CHINA**

Applied concedes that it cannot support a general jurisdiction theory. (Opp. at 8 n.5.) Applied is thus left to argue that the Court has specific jurisdiction over AMEC China.

The test for specific jurisdiction has three requirements:

(1)    the defendant must purposefully direct its activities or consummate some transaction with the forum or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum;

(2)    the claim must be one which arises out of or relates to defendant's contacts with the forum; and

(3)    the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citing *Lake v.*

1

*Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). Applied's brief only addresses purposeful direction, and fails to demonstrate that the other two requirements are satisfied. AMEC China has shown that these other requirements are not met as well. Applied's claims do not arise out of AMEC China's minimal California contacts and the exercise of jurisdiction would not be reasonable.

### A. Applied Must Point to Admissible Evidence and Well-Pled Allegations to Meet its Burden.

In order to defeat AMEC China's motion, Applied must make a *prima facie* case of specific jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). This burden is not as light as Applied contends. Only well-pled allegations, as distinguished from mere conclusory allegations, must be accepted as true. *China Tech. Global Corp. v. Fuller, Tubb, Pomeroy & Stokes*, No. C 05-01793 JW, 2005 WL 1513153, at *3 (N.D. Cal. June 27, 2005) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

### B. Applied's Claims Do Not Arise out of AMEC China's Minimal Contacts with California.

Applied's claims do not arise out of AMEC China's forum-related contacts. Applied pled that the alleged misappropriation occurred in China, not California. (FAC ¶¶ 5, 8, 38, 40, 42-43.) AMEC China's contacts with California are negligible. It sells no products in California, or even in the United States; its business is entirely foreign. AMEC China's most significant contact with California is its occasional use of suppliers located in the Northern District. (*See* Du Decl. (Doc. # 99) at ¶ 6.) It is undisputed that this contact has nothing to do with the claims here, and Applied thus fails to meet the second requirement for specific jurisdiction.

### C. Applied Cannot Establish AMEC China Purposefully Directed Any Relevant Activities Toward California

Applied also has not shown that AMEC China purposefully directed its activities toward California. To meet the purposeful direction requirement, Applied must establish three things: (1) an intentional act; (2) expressly aimed at the forum state; and (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Schwarzenegger,* 397 F.3d at 803. Applied has not met its burden as to the last two of these factors.

1    Applied cannot establish that AMEC China is expressly targeting California, or that harm

2   is likely to be suffered here, because AMEC China's customer base is in Asia, not California.

3   (Peters Decl. (Doc. #57) at ¶¶ 2-6 & Exs. A-E.)  It is undisputed that AMEC China is not

4   registered to do business in California and makes no sales here.  (Du Decl. at ¶ 7.)  There is no

5   express aiming where a defendant uses allegedly misappropriated information to seek sales

6   outside of the forum state.  *Schwarzenegger*, 374 F.3d at 807 (no express aiming despite

7   Schwarzenegger's California residency where advertising was targeted at Ohio, not California).

8   In *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997), a trade secret case, the

9   Fourth Circuit refused to find that the defendants "intentionally targeted" South Carolina, where

10   the defendants' sales were primarily focused on customers throughout the U.S. and Canada.

11    Applied attempts to avoid the import of AMEC China's lack of California sales by

12   arguing that Applied is "a California-based company."  (Opp. at 10.)  But this simplistic argument

13   has been repeatedly rejected by the courts because "[s]uch a theory would always make

14   jurisdiction appropriate in a plaintiff's home state, for the plaintiff *always* feels the impact of the

15   harm there.  *ESAB,* 126 F.3d at 626.  For example, in *Casualty Assurance Risk Insurance*

16   *Brokerage Co. v. Dillon,* 976 F.2d 596, 601 (9th Cir. 1992), the Ninth Circuit rejected the

17   plaintiffs' argument that the " 'effects' of libel are felt and jurisdiction therefore exists wherever

18   the plaintiff resides," holding that such a rule "would undermine the notions of reasonableness,

19   fair play, and substantial justice."  Similarly, in *Amazon.com, Inc. v. Kalayjian*, the court refused

20   to find that it had jurisdiction over a trademark dispute simply because the defendant was aware

21   that Amazon.com used the trademark at issue and that its headquarters were located in

22   Washington.  2001 U.S. Dist. LEXIS 4924 at *10 (W.D. Wash. Feb. 20, 2001); *see also Am.*

23   *Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432-35 (2d Cir. 1971)

24   (where Michigan corporation induced New York plaintiffs' sales employees to leave plaintiffs

25   and use confidential information to solicit plaintiffs' customers in Kentucky and Pennsylvania,

26   location of injury was where plaintiffs lost business, not New York).

27    Just as importantly, the fact that Applied is headquartered in California does not justify a

28   finding of express aiming or harm because Applied is a global company with offices around the

1    world, and derives more revenue from China and Southeast Asia than it does the United States.

2    (Declaration of Kenneth Kuwayti in Support of AMEC Inc.'s and AMEC China's Motions To

3    Dismiss Applied's FAC, ("Kuwayti Decl."), Exs. A & B.)  Applied's CEO has publicly stated

4    that "most of its sales come from outside North America."  (*Id.*, Ex. C.)  As the Ninth Circuit

5    noted in *CyberSell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 420 (9th Cir. 1997), the effects test does

6    not "apply with the same force to [a corporation] as it would to an individual, because a

7    corporation 'does not suffer harm in a particular geographic location in the same sense that an

8    individual does.'"  If AMEC China's actions were expressly aimed anywhere, they were aimed at

9    Asia, not California.  *See Directory Dividends, Inc. v. SBC Commc'ns, Inc.,* No. 01-CV-1974,

10   2003 U.S. Dist. LEXIS 19560 at *14-15 (E.D. Pa. Oct. 23, 2003) (no express aiming where

11   plaintiff did business nationwide).

12          Applied contends nonetheless that AMEC China is targeting California because its

13   intellectual property is located here and was developed in California.  However, courts have

14   declined to find that a plaintiff can obtain jurisdiction in its home state simply because it is

15   alleging misappropriation of trade secrets that are located there.  For example, in *General Steel*

16   *Domestic Sales, LLC v. Suthers,* No. Civ. 2-06-411 LKK/KJM, 2007 U.S. Dist. LEXIS 19231 at

17   *18-19 (E.D. Cal. Mar. 2, 2007), the plaintiff alleged that when the defendant allegedly stole data

18   and provided it to the Colorado attorney general, who then provided it to the Sacramento DA, this

19   was "done in order to hurt plaintiff's business in California, and caused harm in California."  The

20   court rejected the argument, finding that defendants' conduct "involved only the Colorado AG"

21   and was therefore "not expressly aimed at California."  In *Drayton Enterprises, L.L.C. v. Dunker,*

22   142 F. Supp. 2d 1177, 1184 (D. N.D. 2001), the court found that allegations of trade secret

23   misappropriation and interference with contract were not enough, without more, to establish

24   jurisdiction in plaintiffs' home state of North Dakota under the effects test, even though,

25   "[s]urely, the brunt of any injury will be felt in North Dakota."[1]  And in *ESAB,* the Fourth Circuit

26   ─────────────────

[1] Contrary to Applied's suggestion, there is no special jurisdictional rule for interference with
contract.  (Opp. at 12.)  In the three cases Applied cites, jurisdiction was analyzed on a fact-
27   specific basis under the three-part test, and the location of the contract was not considered to be a
particularly important factor.  The cases are readily distinguishable on their facts.  In *Harris*
28                                                                      (Footnote continues on next page.)

1  refused to find specific jurisdiction over a misappropriation of trade secrets claim in the plaintiff's

2  home state because the defendants sales were not targeted there.  126 F.3d at 625; *see also FMC*

3  *Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 502 n.3 (5th Cir. 1982) (where the claim is wrongful use

4  of lawfully acquired trade secrets, the injury-causing conduct occurs where the secret is used).

5         Applied argues that jurisdiction is appropriate because AMEC China "should have been

6  aware" that the alleged misappropriation would harm a California-based company, citing to two

7  District of Kansas cases, *Guang Dong* and *Thermal Components*.  But both of these cases

8  expressly base their holdings on the premise that the defendant "should have reasonably foreseen"

9  that its actions would harm the plaintiff in the forum state.  *Guang Dong Light Headgear Factory*

10  *Co., Ltd. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2007 U.S. Dist. LEXIS 33497 at *18, 22 (D. Kan.

11  May 4, 2007); *Thermal Components Co v. Griffith*, 98 F. Supp. 2d 1224, 1230 (D. Kan. 2000).

12  This Tenth Circuit rule is directly contrary to the U.S. Supreme Court's holding in *Calder v.*

13  *Jones*, as well as the law of the Ninth Circuit, and the California Supreme Court.  In *Calder,* a

14  libel case, the Supreme Court held that the "mere fact that [defendants] can 'foresee' that the

15  [allegedly libelous] article will be circulated and have an effect in [the forum state] is not

16  sufficient for an assertion of [specific personal] jurisdiction."  465 U.S. 783, 789 (1984).  The

17  Ninth Circuit is in accord: "We construed *Calder* to require 'something more' than mere

18  foreseeability in order to justify the assertion of personal jurisdiction in California over the

19  Georgia defendant." *Schwarzenegger*, 374 F.3d at 805 (citing *Bancroft & Masters*, *Inc., v.*

20  *Augusta Nat'l Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000)).  And the California Supreme Court has

21  made clear that, under the California long-arm statute, "[m]erely asserting that a defendant knew

22  or should have known that his intentional acts would cause harm in the forum state is not enough

23  (Footnote continued from previous page.)

24  *Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, the court only applied the effects test after it had
    already concluded, in contrast to this case, that the defendant had "purposefully availed itself of

25  the benefit and privilege of conducting activities in California" over a five year period. 328 F.3d
    1122, 1131 (9th Cir. 2003) (citation omitted).  In *Brainerd v. Governors of the Univ. of Alberta*,

26  the alleged communications to Arizona defaming the plaintiff professor were the basis for
    asserting liability in the case.  873 F.2d 1257, 1258-60 (9th Cir. 1989).  In *CE Distribution, LLC*

27  *v. New Sensor Corp.*, jurisdiction was found based on the defendants "awareness of the harm to
    CE's exclusive business located in Arizona."  380 F.3d 1107, 1111 (9th Cir. 2004).

28

1    to establish jurisdiction under the effects test." *Pavlovich v. Sup. Ct.*, 29 Cal. 4th 262, 270-71

2    (2002).

3        Applied's opposition totally ignores the location of the alleged wrong, because to do

4    otherwise would be to concede there is no jurisdiction.  In fact, Applied does not allege that any

5    of the allegedly wrongful conduct took place in California.  The foundation for all of Applied's

6    claims is the alleged misappropriation of trade secrets.  Yet Applied has provided no evidence to

7    demonstrate that the alleged misappropriation, whether it took the form of acquisition, disclosure

8    or use, occurred in California.  Applied pleads that its trade secrets were acquired by its

9    employees "while employed by Applied" (FAC ¶ 8), so the only potential tortious acts are

10   disclosure and use, which could only have taken place in China (*e.g.*, FAC ¶¶ 31, 37).[2]

11       A Florida court rejected specific jurisdiction in a well-reasoned case remarkably similar to

12   this one.  In *Arch Aluminum & Glass Co. v. Haney*, the defendant hired the Florida plaintiff's

13   national sales manager, who took with him a confidential business plan for the Phoenix region

14   that "contained all of [the plaintiff's] customer names, prior sales, and future sales projections for

15   the Phoenix area."  964 So. 2d 228, 231 (Fla. Dist. Ct. App. 2007).  The defendant used this

16   information to open a competing business in Nevada and target plaintiff's customers in the

17   Western states.  *Id.*  The court held that "[t]he 'focal point' of the effects of the misappropriation

18   was in the west where Desert Glass competed with Arch.  It was not directed at Florida, nor did it

19   seek the benefits of Florida law or affect Florida consumers in any way."  *Id.* at 235.  The court

20   held that the facts showed there were "no minimum contacts between Desert Glass and Florida.

21   _____

22   [2] Applied's citation to *Portrait Displays* is inapposite because there, unlike here, the
     misappropriation occurred in the forum state.  *Portrait Displays, Inc. v. Speece*, No. C-04-1501
     RMW, 2004 U.S. Dist. LEXIS 18595 at *18-19 (N.D. Cal. Sept. 3, 2004).  *Facebook* is similarly

23   distinguishable because the defendant used a computer program to illicitly log onto Facebook's
     California servers and the accounts of California residents.  *Facebook, Inc. v. ConnectU LLC*, No.

24   C07-01389 RS, 2007 U.S. Dist. LEXIS 61962 at *4, 6-7 (N.D. Cal. Aug. 13, 2007).  *Yahoo, Inc.*,
     *Bancroft & Masters*, and *Panavision* — which are not trade secret cases but are cited for the

25   proposition that the alleged targeting here "easily exceeds" that in cases where jurisdiction has
     been found — also do not apply.  Opp. at 11.  In each of those cases, the court found that

26   defendants' conduct outside California was intended to induce the plaintiff to take some action in
     the state, a fact that is completely absent here.  *See Yahoo! Inc. v. La Ligue Contre Le Racisme et*

27   *L'Antisemitisme*, 433 F.3d 1199, 1209 (9th Cir. 2006); *Bancroft & Masters*, 223 F.3d at 1087;
     *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1319 (9th Cir. 1998).

28

1    Desert Glass operates exclusively in the western United States. It does not compete for customers

2    in Florida or have any business interests in this state." *Id.*

3         This case is just like *Arch Aluminum*, substituting China and California in place of Nevada

4    and Florida.  Applied alleges that AMEC China recruited employees to go to China and is using

5    its secrets in China.  Applied does not allege that any misappropriation occurred in California.

6    AMEC China operates exclusively in Asia.  It does not compete for any customers in California

7    or have any business interests in California.  The focal point of the effects of the alleged torts is

8    China, not California.  AMEC China does not have minimum contacts with this forum.

9         To try to make up for the absence of any wrongdoing in California or conduct aimed at

10   this state by any of the Defendant companies, Applied repeatedly argues that Gerald Yin

11   incorporated AMEC China before he retired from Applied, claiming that, when Mr. Yin

12   "announced his 'retirement' at the age of 60, after 36 years of employment capped by a thirteen-

13   year career at Applied, he had already — unbeknownst to Applied — formed AMEC China."

14   (Opp. at 3.)  This claim is false.  As Applied must know, Dr. Yin retired from the company on

15   January 31, 2004 — a retirement that was celebrated with a party thrown by Applied that more

16   than 150 people attended.  While Dr. Yin technically remained on Applied's payroll until August

17   so he could be paid for his accrued vacation and sick leave, his departure from the company in

18   January is confirmed by his Employee Exit Package Termination Certification, in which Dr. Yin

19   certified that he had returned all Applied confidential documents on January 20, 2004.  (Kuwayti

20   Decl., Ex. H.)  This was months before any AMEC entity was allegedly formed.  (*See* Opp. at 3.)

21   (These events, and others from Applied's FAC, are shown in the timeline attached hereto as

22   Exhibit A.)

23        There was thus nothing improper about Dr. Yin's departure.  "An employee may, after

24   retiring, compete with his former employer in the same business or even for the same custom."

25   *Sarkes Tarzian, Inc. v. Audio Devices, Inc.*, 166 F. Supp. 250, 264 (C.D. Cal. 1958).  Perhaps

26   more importantly, however, this allegation has nothing to do with any of the claims in this

27   lawsuit.  Applied chose to dismiss Dr. Yin from the action, along with the other three individuals

28   it had sued for misappropriation, because their presence in this suit destroyed diversity

1    jurisdiction.  Having voluntarily dismissed Dr. Yin to obtain jurisdiction in this Court, Applied

2    cannot try to rely on his alleged conduct as a basis for its jurisdiction claim now.

3    Applied also places heavy reliance on the alleged recruiting of Applied employees in

4    California.  As an initial matter, there is absolutely nothing wrong with hiring a competitor's

5    employees.  *Id.* ("There is no tort if, by legal means, one induces an employee to sever his

6    employment with another.").  California has a statutorily-expressed public policy in favor of

7    employee mobility.  Cal. Bus. & Prof. Code § 16600.  "The interests of the employee in his own

8    mobility and betterment are deemed paramount to the competitive business interests of the

9    employers, where neither the employee nor his new employer has committed any illegal act

10   accompanying the employment change."  *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 255

11   (1968).

12   In its brief, Applied contends that "[t]he entire platform from which AMEC committed

13   these torts was built on contacts with California."  (Opp. at 12.)  But it has not submitted a single

14   piece of evidence to support this claim.  The allegations in its complaint are equally conclusory:

15   Applied contends that the Defendants "seeded their companies with a multitude of former

16   Applied employees, ranging from Applied corporate vice presidents to technologists and

17   engineers" and that it "estimates that at least 30 of its former employees are now employed by the

18   Defendants."  (FAC ¶ 6, 35.)  Entirely absent from the complaint, and from the evidence

19   submitted in opposition to this motion, is any description (or even an allegation) of solicitation

20   that took place in California, an identification of the thirty individuals now working at AMEC

21   China, when they were recruited, whether they were even working in California or for Applied at

22   the time, or a description of their tie to the allegedly misappropriated trade secrets.[3]

23   The allegations relating to the four individuals Applied that does identify in its Complaint

24   (referred to as the "AMEC Employees") are instructive.  Applied acknowledges that AMEC

25   ─────────────

26   [3] Applied's purported excuse for this failure is that it has not received sufficient discovery.  (Opp.
     at 16 n.7.)  But much of this evidence, such as identification of the departed employees, is within
     Applied's own control.  And if the alleged recruiting was as widespread as Applied suggests,
27   there should be evidence of that effort already in Applied's possession, including from current
     Applied employees who were recruited by AMEC who declined to leave Applied.

28

1   founder Steve Chen left Applied in November 2003, at least five months before AMEC China

2   was incorporated.  (FAC ¶ 24.)  Applied alleges that Ryoji Tokada left Applied even earlier, in

3   January 2003.  (*Id.* ¶ 26.)  Applied has mischaracterized the retirement date of Dr. Yin, who, as

4   noted above, left the company in January 2004.  The fourth, Lee Luo, is the only individual

5   alleged to have still been working at Applied after AMEC China was formed, but Mr. Luo

6   worked at Applied until January 2006 (*id.* ¶ 26), which means he did not participate in the

7   allegedly wrongful filing of the Chinese patent applications in 2005.  (*Id.* ¶¶ 37, 42.)

8          In fact, it is hardly surprising that some former Applied employees would be working for

9   AMEC China.  Applied is the largest company in this industry, and boasts that it "has been the

10  world's leading semiconductor equipment manufacturer since 1992."  Joint Case Management

11  Conference Statement (Doc. # 96, filed 1/21/08) at 2:2-3.  AMEC states on its website that it

12  employs more than 14,500 people worldwide.[4]  In an industry characterized by high mobility and

13  relatively few players, Applied itself no doubt employs hundreds of individuals, if not more, who

14  have worked for its competitors.  Every one of its senior officers worked elsewhere before

15  coming to Applied, including its President and CEO, Michael Splinter (Intel Corporation) and the

16  General Manager of Applied's Silicon Systems Group (Novellus).  (Kuwayti Decl., Ex. I.)[5]

17         In addition to failing to cite any factual evidence supporting its solicitation claim, Applied

18  has not cited to a single case, from California, the Ninth Circuit or anywhere else holding that

19  lawful recruiting of employees in a forum state is a sufficient basis for finding specific

20  jurisdiction over trade secret misappropriation or any of the other claims in this lawsuit.  Applied

21  cites to *dicta* from *Drayton*, stating that if the defendant "'entered' North Dakota to 'entice' the

22  employee away …'the case for jurisdiction might well be stronger.'"  142 F. Supp. 2d at 1184.

23  The only solicitation case it cites to is *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 720 (D. S.C.

24  2007).  But in *Nucor*, there was an express non-solicitation agreement, and jurisdiction was based

---

[4] *See* http://www.appliedmaterials.com/about/index.html.

[5] Applied has also undergone several widely publicized mass layoffs, terminating thousands of people in the relevant timeframe—and just recently laid off a thousand more.  (Peters Decl. (Doc. # 48), Exs. D-F; Kuwayti Decl., Ex. C.)  One of these laid-off employees was Ryoji Todaka, who worked at another company in Japan for more than a year before coming to AMEC China.

1    on an ex-employee's solicitation in the forum state in violation of that agreement. *Id.* at 722-23.

2    Further, in *Nucor,* unlike here, there was evidence that trade secret material was improperly

3    downloaded by one of the solicited employees in the forum state. *Id.* at 720.

4        In sum, because Applied has failed to establish that any wrongful actions took place in or

5    targeted California, the Court cannot exercise specific jurisdiction.

6                **D.      Exercise of Jurisdiction Here Would be Unreasonable.**

7        AMEC does challenge the reasonableness of the exercise of jurisdiction in this case.

8    Courts generally look at seven factors when determining reasonableness: (1) the extent of the

9    defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant

10   of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state;

11   (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution

12   of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and

13   effective relief; and (7) the existence of an alternative forum. *Core-Vent Corp. v. Nobel Indus.*

14   *AB*, 11 F.3d 1482, 1487-1488 (9th Cir. 1993). AMEC China's sole California contact is the

15   occasional use of California suppliers, making its purposeful interjection minimal, at best. The

16   remaining factors favor AMEC China, as described in AMEC Inc.'s *forum non conveniens*

17   argument. Exercise of jurisdiction here would thus be unreasonable. Because Applied fails to

18   meet the third requirement for specific jurisdiction, the action should be dismissed.

19        **II.     CONDUCT IN CHINA DOES NOT ESTABLISH A CAUSE OF ACTION**
         **UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT**
20

21        Applied does not appear to contend that California's UTSA applies extraterritorially. As

22   the California Supreme Court held in *Diamond Multimedia,* while a state has the power to

23   legislate conduct outside of its boundaries, "'the presumption is that it did not intend to give its

24   statutes any extraterritorial effect. The intention to make the act operative, with respect to

25   occurrences outside the state, will not be declared to exist unless such intention is clearly

26   expressed or reasonably to be inferred from the language of the act or from its purpose, subject

27   matter of history.'" *Diamond Multimedia Sys., Inc. v. Sup. Ct.,* 19 Cal. 4th 1036, 1059 (1999)

28   (quoting *N. Alaska Salmon Co. v. A.J. Pillsbury,* 174 Cal. 1, 4 (1916)). Applied does not point to

1    anything in California's UTSA or its legislative history to suggest that California's UTSA was

2    intended to have extraterritorial effect.

3        Instead, Applied argues that "injury to California residents is sufficient for application of

4    California law." (Opp. at 18.) That is not the law. Essentially, Applied is arguing that a person

5    or corporation resident in California is entitled to have California law applied to every transaction

6    or event that occurs anywhere in the world, regardless of its connection to California. But the

7    extraterritoriality analysis is focused on conduct, not residency. As the California Supreme Court

8    stated in *Diamond Multimedia,* "[t]he presumption against extraterritoriality is one against an

9    intent to encompass ***conduct*** occurring in a foreign jurisdiction in the prohibitions and remedies

10   of a domestic statute." 19 Cal.4th at 1060 (emphasis in original). Thus, the court held that out-

11   of-state purchasers could bring an action under California Corporations Code section 25400 for

12   stock whose price was affected by market manipulation that occurred in California. *Id.* at 1059.

13       Where the alleged conduct took place out of state, Applied's claim of California residency

14   does not justify the extraterritorial application of a statute. In *Chaplin v. Greyhound Lines, Inc.*,

15   for example, the court found that the plaintiff, an Oakland resident, could not bring a claim under

16   California's Unruh Act. No. C-94-3799 MHP, 1995 WL 419741, *5 (N.D. Cal. July 3, 1995).

17   The plaintiff's claim was based on having to leave a bus en route to her home in California after

18   the driver insisted that her children give up their seats for other passengers — an act she alleged

19   was racially motivated. *Id.* at *1. The plaintiff characterized her claim as "a course of conduct

20   which began in El Paso but continued and caused injury in California for the succeeding three

21   weeks." *Id.* at *5. The court disagreed, finding that plaintiff's injury from her late arrival in

22   Oakland "cannot [] be characterized as a discrete action," but was "more accurately described as

23   an injury resulting from actions taken in Texas" and thus beyond the reach of the statute. *Id.*

24       Similarly, in the *Alaska Salmon* case, the California Supreme Court found that the

25   Worker's Compensation Act did not apply to a plaintiff who entered into a contract for

26   employment in San Francisco with a San Francisco company for salmon fishing in Alaska,

27   because the occurrence giving rise to the injury took place entirely out of state. *N. Alaska

28   Salmon,* 174 Cal. at 1-2.

1       The cases Applied cites do not hold that injury to a California resident is enough to justify

2   application of a statute that has no extraterritorial effect.  Rather, they hold only that a statute is

3   given effect when the conduct or injury occurs within the state of California.  But injury does not

4   occur wherever a plaintiff is resident.  For example, in *Norwest Mortgage, Inc. v. Sup. Ct.*, 72

5   Cal. App. 4th 214, 217 (1999), there was injury to class members in California because the UCL

6   cause of action arose out of insurance that they were forced to take for trusts and mortgages

7   "encumbering California real estate."  In discussing *Norwest,* the court in *Speyer v. Avis Rent A*

8   *Car System, Inc.*, 415 F. Supp. 2d 1090, 1099 (S.D. Cal. 2005), explained that *Norwest* "stand[s]

9   for the proposition that the UCL applies to wrongful conduct that occurs out-of-state but results in

10  injury in California, regardless of the injured party's citizenship."  The *Speyer* court emphasized

11  that injury does not occur in California simply because a plaintiff is resident there.  The UCL

12  claim in *Speyer* arose out of improper concession fees for car rentals.  The court held that to the

13  extent the California plaintiffs were claiming they were "injured by unfair concession fee

14  *charges*, any injury suffered may have occurred out-of-state where the rental vehicle was located

15  and the transaction was completed."  *Id.*[6]  Here, there is no claim that defendants improperly

16  acquired Applied's trade secrets in California or made sales in this state.

17      Similar to *Speyer, Chaplin*, and *Alaska Salmon,* Applied has no claim under California's

18  UTSA because the alleged injury did not occur in California.  Applied's argument that the

19  allegedly wrongful conduct "substantially occurred" in California (Opp. at 17) is unsupported by

20  the facts or even by Applied's FAC.  If any misappropriation took place, it occurred in China, so

21  California's UTSA does not apply.

22  **III.    APPLIED'S SECOND, THIRD AND FOURTH CAUSES OF ACTION ARE**
        **PREEMPTED**

23

24      Applied's second, third and fourth causes of action for conversion, unfair competition, and

25  interference with contract, are preempted under California's Uniform Trade Secrets Act because

26  _____

[6] Applied also cites *Nat'l Notary Ass'n v. U.S. Notary,* No. D038278, 2002 Cal. App. Unpub.
27  LEXIS 1947 (June 7, 2002).  But this state appellate decision is not certified for publication, and
    distinguishes *Norwest* on the grounds that the conduct "was not committed wholly outside the
28  state."  *Id.* at *13.

1    each cause of action is based upon the alleged misappropriation of trade secrets.

2        Applied seeks to minimize the preemptive effect of California's UTSA.  (Opp. at 18.)

3    However, the statute "has been interpreted as having a broad preemptive effect similar to the

4    model UTSA."  *Convolve, Inc. v. Compaq Computer Corp.,* No. 00cv5141(GBD), 2006 U.S.

5    Dist. LEXIS 13848, *21 (S.D.N.Y. Mar. 29, 2006) (applying California law).  Consistent with the

6    language of the statute, which provides that the only civil remedies not displaced are those that

7    are "not based upon misappropriation of a trade secret," Cal. Civ. Code § 3426.7, courts have

8    consistently held that all causes of action that are "based on" a misappropriation of trade secrets

9    are preempted.  *See, e.g., Digital Envoy, Inc. v. Google, Inc.,* 370 F. Supp. 2d 1025, 1033 (N.D.

10   Cal. 2005).  "In other words, if the operative facts are arguably cognizable under the UTSA, any

11   common law claim that might have been available on those facts in the past now no longer

12   exists."  *Convolve,* 2006 U.S. Dist. LEXIS 13848, *25.

13       The complaint shows that each of Applied's three alternate causes of action is preempted

14   under this standard.  The intentional interference claim alleges that Defendants "intentionally

15   sought and did obtain confidential Applied information from the AMEC Employees," and

16   induced them to assign patent applications to AMEC containing this confidential information.

17   (FAC ¶¶ 57-58, 39-42.)  The conversion claim alleges that defendants "have wrongfully taken for

18   themselves inventions, and resulting patent applications."  (*Id.* ¶ 63.)  The unfair competition

19   claim is that defendants have "misused Applied's trade secrets, confidential information and

20   proprietary technology to unfairly compete with Applied."  (*Id.* ¶ 68.)

21       Applied argues for a different standard, suggesting that the UTSA does not preempt

22   claims that are "based on additional or independent factual allegations."  (Opp. at 19.)  The case

23   law is clear, however, that simply alleging "additional" factual allegations is not enough.  *See*

24   *Convolve,* 2006 U.S. Dist. LEXIS 13848, *24-25.  Each of Applied's common law claims is

25   "arguably cognizable" as a UTSA claim, and is therefore preempted.  *Id.* at *25.

26       Directly on point is *Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc.,* 318 F.

27   Supp. 2d 216 (D. Del. 2004).  In *Callaway Golf,* the plaintiff argued that its negligence claim was

28   not preempted under California's UTSA because it "plainly spells out additional elements of a

1    claim, including a breach of duty, which concerns additional facts and different injuries." *Id.* at

2    220. The court rejected the argument and found the negligence claim was preempted, because,

3    despite additional allegations and requirements for a negligence claim, the allegations of trade

4    secret misappropriation alone comprised the underlying wrong. The negligence claim was

5    preempted because "if Dunlop loses its misappropriation claim with respect to the Felipe binder,

6    it could not recover on its negligence claim." *Id.* at 220-21 (citation omitted). That is exactly the

7    case here—if Defendants did not wrongfully take Applied's confidential information, then there

8    would be no intentional interference, conversion, or unfair competition.

9        *AirDefense, Inc. v. AirTight Networks, Inc.*, No. C 05-04615 JF, 2006 WL 2092053, *4-6

10   (N. D. Cal. July 26, 2006), is entirely in accord with *Callaway*, contrary to Applied's argument.

11   In *AirDefense*, the court found plaintiffs' claims for common law and statutory unfair

12   competition, interference with contract, conversion and unjust enrichment were all preempted by

13   the UTSA. The plaintiff in *AirDefense* argued that its claim for unfair competition should not be

14   preempted because it was "based not only on the information that was misappropriated but also

15   on what AirTight did with the information." *Id.* at *4. The court rejected that argument, holding

16   that "if the information was not misappropriated, AirTight has the right to use it. Thus, the claim

17   for common law unfair competition is based on the underlying allegation of trade secret

18   misappropriation and is preempted by the CUTSA." *Id.* at *4. The only claim not preempted in

19   *AirDefense* was interference with prospective economic advantage, because that claim alleged the

20   defendant made "false representations" to the plaintiffs' customers concerning the parties'

21   "products and capabilities"—an allegation that did not depend on the trade secret claim. *Id.* at *5.

22       The only additional allegation that Applied points to here is its claim that its former

23   employees improperly assigned to AMEC China and AMEC Asia patent applications that were

24   purportedly based on confidential information that they learned at Applied. This assignment is

25   described by Applied as a "breach" of employment agreements, a conversion of "contractual

26   rights" and an "unlawful business practices." (Opp. at 19.) Just as in *Callaway* and *AirDefense*,

27   however, this claim is based upon misappropriation of trade secrets because, if the information

28   contained in the patent application was not misappropriated from Applied, then there was nothing

1   improper about the assignment.  While Applied argues that the facts relating to the assignment of

2   the patent applications "are independent of those underlying the misappropriation claim" (Opp. at

3   19), the complaint shows that this is not true.  The patent applications are virtually synonymous

4   with the allegedly misappropriated trade secrets.  (*See, e.g.*, FAC ¶¶ 40-43, 46, 50.)  Having made

5   these allegations, Applied can hardly contend now that the two claims are independent.

6        The two other cases cited by Applied have very different facts and do not support its

7   argument.  In *Eldorado Stone, LLC v. Renaissance Stone, Inc.*, the court found that the plaintiff

8   had presented sufficient evidence of the independent "wrongful conduct," apart from trade secret

9   misappropriation, that is needed to support an interference with prospective economic advantage

10  claim.  No. 04cv2562 JM (CAB), 2007 US Dist. LEXIS 60885, *14-15 (S.D. Cal. Aug. 20,

11  2007).  This included, among other things, infringement of trade dress, selling of counterfeit

12  goods, and predatory pricing practices.  *Id.* at *15.  *PostX Corp. v. Secure Data in Motion, Inc.*

13  presented a unique "procedural posture," where the court had previously granted summary

14  judgment of plaintiffs' trade secret claim on procedural grounds, but allowed an amended

15  complaint alleging unfair competition to go forward based on new facts that had not been brought

16  to the court's attention before summary judgment.[7]  No. C02-04483 SI, 2004 U.S. Dist. LEXIS

17  24260, *11-13 (N.D. Cal. Nov. 20, 2004).  Neither case saves Applied's claims from preemption.

18
19  **IV.    THE CASE SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS**

20       AMEC China joins AMEC Inc.'s motion to dismiss for *forum non conveniens*.  The

21  arguments made by AMEC Inc. apply with equal force to AMEC China.  The Court should

22  dismiss the action and order Applied to refile its claims in China.

23  Dated: February 11, 2008    HAROLD J. MCELHINNY
                                KENNETH A. KUWAYTI
24                              MARC DAVID PETERS

25                              By:   /s/ Marc David Peters
                                      Marc David Peters

26  _____
27  [7] *Digital Envoy , Inc. v. Google, Inc.,* 370 F. Supp. 2d 1025, 1034-35 (N. D. Cal. 2005) found
    *PostX* "not particularly persuasive" because of this procedural posture and because the decision
    failed to take into account relevant authority.

28



# AMEC Defendants Timeline

**Dec 4, 2007** — AMEC announces debut of Etch and CVD tools at SEMICON Japan

**Aug 5, 2005** — AMEC China files CVD application in China (Chen and Todaka, inventors)

**Aug 5, 2005** — AMEC China files Etch application in China (Yaomin Xia, inventor)

**Jan 13, 2006** — Luo leaves Applied

20 months: more than one year

**Nov 24, 2003** — Chen leaves Applied

**Jan 20, 2004** — Yin certifies return of all confidential Applied documents, retires 11 days later

**Mar 2, 2004** — AMEC Inc. formed

**May 31, 2004** — AMEC China formed

**Jan 4, 2003** — Todaka laid off by Applied

Jan 2003 | Jul 2003 | Jan 2004 | Jul 2004 | Jan 2005 | Jul 2005 | Jan 2006 | Jul 2006 | Jan 2007 | Jul 2007 | Jan 2008

AMEC China Reply Brief Exhibit A