1 of 1 DOCUMENT

Copyright (c) 2006 The Ohio State University
Entrepreneurial Business Law Journal

2006

1 Entrepren. Bus. L.J. 323

**LENGTH:** 9239 words

ARTICLE: DO STRICT TRADE SECRET AND NON-COMPETITION LAWS OBSTRUCT INNOVATION?

**NAME:** CHARLES TAIT GRAVES AND JAMES A. DIBOISE *

**BIO:**

>  * Charles Tait Graves is an associate and James A. DiBoise is a partner at Wilson Sonsini Goodrich & Rosati in San Francisco, California.

**HIGHLIGHT:** *This Article examines whether non-competition covenants and overbroad trade secret laws operate to restrict innovation and impede the growth of small, creative businesses - especially those founded by former employees of larger, established companies. We summarize the nascent scholarship around these issues, and pose several questions for future research by legal scholars and economists. We then critically analyze aspects of non-competition, fiduciary duty, and trade secret law -- bodies of law which we refer to as "the law of employee mobility. " We conclude that reform in these areas would likely promote innovation, and we invite further discussion around these important but neglected areas of law.*

**TEXT:**

   [*323]  I. INTRODUCTION

   To what extent do a given jurisdiction's trade secret, employee mobility, and non-competition laws affect the success of a venture-backed innovation community? We believe that a less restrictive regime in these areas of law is more likely to foster the growth of entrepreneurial, creative companies. That conclusion may seem counter-intuitive or even controversial. After all, much of the mythology of intellectual property law holds that strong laws protect inventors and foster innovation.  n1 We take the opposite approach with respect to non-competition agreements, overbroad trade secret rules, and other practices that make it difficult for creative employees to quickly and easily change jobs.

   In this article, we will outline our argument, describe the scholarly debate on these issues, and comment briefly on six areas of law that may impede local development of venture-financed technology companies. Our experience as litigators who defend employees and start-up companies targeted by former employers allows us to comment on how these doctrines  [*324]  unfold in actual practice, and to illustrate the overreaching and unfairness that often results.

   Employee mobility--or the ease by which a skilled employee can leave one job, join another company, and immediately apply his or her skills--is a necessary ingredient of a successful venture-backed business region. Almost by definition, small and creative start-up companies funded by venture capital are short-lived and require the ready availability of skilled founders and employees. The structure of innovation communities is one of multiplicity and speed--numerous small efforts racing to meet common goals, without direction from above. The structure is not one where a small number of large, hierarchical, and long-established companies maintain a monopoly over local talent.

   But in too many jurisdictions in the United States, archaic noncompetition rules sideline employees who seek to resign from one company and found or join another. It is astonishing that courts in twenty-first century America still apply restrictive covenants developed to control laborers in feudal England in order to prevent skilled technical employees from joining the company of their choice, and thus slowing innovation. In turn, overly restrictive trade secret rules oper-

Case 5:07-cv-05248-JW     Document 158-2     Filed 06/02/2008     Page 2 of 16

Page 2
1 Entrepren. Bus. L.J. 323, *

ate as court-created noncompetition agreements and all too easily allow former employers to bury a new start-up in legal fees and amorphous, ever-changing accusations of trade secret theft.

We are not alone in questioning whether restrictions on employee mobility, enforced in the name of protecting existing businesses, operate to harm the overall economy of a given jurisdiction by inhibiting the spread of venture-backed start-up companies. In recent years, a number of scholars have begun studying the relative success of innovation communities, with a focus on their respective legal regimes. In this article, we will outline this scholarship, and then outline several areas of law where trade secret and non-competition rules appear overly-restrictive, or too readily abused by lawyers who seek to impede employee mobility and start-up enterprises. At the same time, we will outline the debate on these issues, including challenges posed by defenders of the traditional restrictive regime. We will then indicate areas where we believe further research by economists and legal scholars might be useful to test the effects of restrictive employee mobility rules.

Our argument should not be taken as reductive--we do not argue that merely abandoning archaic restrictions on employee mobility alone would necessarily result in the formation of more innovative businesses. The legal regime is only one possible factor affecting the relative success of a given entrepreneurial community. Other factors may ultimately prove more important--such as proximity to top-notch universities, meritocratic openness to immigrants and a diverse employee base, and the social status accorded to creators and innovators. All the same, a legal structure that promotes competition and employee mobility must surely open more [*325] possibilities than do restrictive rules descended from feudal England and the age of factory labor and applied without regard to whether they best meet contemporary needs.

II. THE EFFICACY OF EMPLOYEE MOBILITY RULES: THE SCHOLARLY DEBATE

The proliferation of technology-based businesses has led many thinkers to reconsider intellectual property laws created in a different social and economic environment--often that of the nineteenth century or before. Attorneys and law professors have questioned whether such rules best promote innovation and whether they provide a proper balance between the employees who create new ideas and the companies who provide the resources for the development of those ideas. This discussion is part of a wider debate over restrictive intellectual property rules, beyond trade secret law. n2 Some thinkers, such as Eben Moglen of Columbia Law School, criticize the entire structure of intellectual property jurisprudence for its tendency to centralize the control of information. n3 Others, such as Catherine Fisk of Duke, advocate redrawing the rules to better protect and benefit employee-inventors. n4

Still others focus on reforming the existing trade secret and noncompetition systems by comparing the legal regimes governing different innovation communities. That narrower discussion, one of many current debates regarding the efficacy of various intellectual property rules, is the focus of this article.

By the mid-1990s, California's Silicon Valley had pulled ahead of Boston's Route 128 as the more successful innovation community. The former had, since the 1960s, become the incubator to rhizomatic networks of rapidly proliferating start-up companies. The latter, by contrast, experienced some similar success but remained more wedded to the big company model. This led two prominent scholars, Professors Ronald Gilson of Stanford and Annalee Saxenian of Berkeley, to publish separate analyses of possible reasons for the disparity. Both theorized that Silicon Valley's success was related to the tendency of skilled employees to move [*326] from company to company, and to more easily apply the knowledge they developed along the way. n5

Professor Gilson focused more explicitly on jurisprudential differences between California, which has barred noncompetition agreements by statute since 1872, and Massachusetts, which permits noncompetition covenants. He argued that California's statute had the probably unintended consequence of making job-hopping easier, and thus promoting a community of entrepreneurial technology start-up companies. n6 Challenging the common belief that strong intellectual property laws are necessary to promote economic growth, Professor Gilson used the term "knowledge spillovers" to describe the dissemination of information and experience that results from employee mobility and argued that such spillovers form a necessary constituent of Silicon Valley's success. n7 Some degree of information-sharing between companies spurs innovation, because innovation rarely takes place in a vacuum, apart from an infrastructure that promotes it. n8

Following Gilson and Saxenian, another commentator has described how former employers can use other legal theories--such as antitrust and tortious interference lawsuits--in the same manner as trade secret and non-competition laws to stifle the employee mobility that appears to contribute to successful technology regions. n9

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 3 of 16

Page 3
1 Entrepren. Bus. L.J. 323, *

If these theories are correct, the legal implications are of vast importance. There appears to be consensus across the political spectrum that the economy is ever more knowledge-based, and that an individual employee's intellectual talents matter far more than in the past. n10 If a given [*327] jurisdiction applies strict non-competition and trade secret laws in the name of protecting innovation, it may be harming both employees and employers on the whole.

Not all scholars agree, though none has published an extensive rebuttal to Gilson or Saxenian. Perhaps the most important and thoughtful challenge to Gilson's theory regarding non-competition clauses was one by Jason Wood. Wood noted that venture financing and start-up success was also prevalent in regions where non-competition clauses are legal, such as Austin, Texas, and North Carolina's Research Triangle, and not just in Silicon Valley. n11 Thus, Wood suggests, Professor Gilson may have attributed undue importance to the absence of non-competition agreements in Silicon Valley. n12 At the same time, Wood seems to accept the more general theory that "knowledge spillovers" provide economic benefits, and notes that employers in places like Austin may not have actually applied or enforced non-competition clauses during the period in question. n13 In other words, the fact that a jurisdiction allows non-competition clauses itself provides no data as to whether employers actually use and enforce them. Our own experience regarding Texas high-tech employees suggests that at least some prominent Texas employers do not use non-competition agreements, perhaps because, as Wood suggests, they are a hindrance in attracting skilled employees.

Other commentators seem unaware of the current debate and offer arguments in favor of non-competition and trade secret rules with little basis in the everyday reality of start-up formation and employee mobility litigation. *Forbes Magazine,* for example, argued polemically in 2004 that non-competition clauses are "a boon to the economy" according to "economic theory." n14 The only theory offered, however, was an assertion that non-competition clauses allow employers to invest in skilled employees n15 --assuming that most employers actually provide training to highly skilled employees in the first place, and that those who do would not do so if non-competition clauses were unavailable.

[*328] Another example, focused on trade secret law, argued that even if there is some "social gain" when a "thief" takes "trade secrets," such free flow of information is "offset" by a claimed "reduction in the incentive to invent." n16 This article, by three Law and Economics thinkers, makes the serious error of assuming that trade secret litigation typically involves a secret previously known to the employer, zealously guarded, and stolen by a conscious wrongdoer to avoid the costs of development. To the contrary, and as we will describe in more detail below, much trade secret litigation involves "secrets" drawn up after the fact by the plaintiff's lawyers, on the borderline between what may be secret and what may be the employee's general skills and knowledge (if not entirely non-secret), and used by the former employee because he or she believed it to be non-secret.

This bias--assuming that employers only sue to protect legitimate secrets, and that trade secret law is something akin to the penal law--is all too common among those who defend the existing legal regime. The bias can affect calls for reform. Two commentators recognize the problems that non-competition agreements pose for mobile employees, but suggest that courts appoint referees to determine the proper length of non-competition clauses--apparently the proper length would be the date when the information known to the former employer becomes stale. n17 This approach does nothing to alleviate problems for mobile employees or address the issues raised by Professor Gilson and others, and seems to place primary importance on protecting the former employer from competition.

We take issue with the concept that protecting an employer from competition by its former employees should be the primary aim of state trade secret and employee mobility regimes. We believe that Professor Gilson and others who have critiqued overbroad non-competition and trade secret restrictions are likely correct in their assessment, and that promoting innovation means rethinking the legal rules that snare mobile employees in almost every state. If, as it seems, employee mobility is a key ingredient in the formation of successful innovation communities, n18 restrictions that irrationally limit employee mobility must be called into question.

[*329] III. THE LEGAL REGIME OF EMPLOYEE MOBILITY: CONTESTED RULES AND ARCHAIC RESTRICTIONS

We have outlined the scholarly debate as a background to discuss six areas of trade secret and employee mobility law whose rules may impact the success of a venture-financed high-tech community. Our contribution to this debate comes from our experience litigating and counseling mobile employees and creative start-up companies. We have seen firsthand, and repeatedly, the types of problems overbroad trade secret rules can have--to say nothing of non-competition covenants, which often prevent inventive people from starting or joining the business they desire. We believe that there are several areas of law in need of reform, and that a given jurisdiction should enact reforms if it wishes to better promote innovation.

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 4 of 16

Page 4
1 Entrepren. Bus. L.J. 323, *

Specifically, there are at least six areas of law where restrictions on employee mobility likely impede the development of entrepreneurial communities. Three of these involve the law of contract and fiduciary duty: non-competition covenants, non-solicitation covenants, and the ability of a fiduciary to "prepare to compete" before resigning from his or her current company. Three involve trade secret law. the "inevitable disclosure" doctrine, judicial skepticism towards frequently-altered secrecy claims, and several procedural tactics used against former employees. We will discuss each in turn.

A. *Non-Competition Covenants*

Perhaps no restriction on employee mobility more inhibits the success of venture-backed innovation communities than non-competition covenants, and perhaps none is as difficult to justify. The persistence of non-competition covenants into our era, long after the age of lifetime employment has ended and when one's skills are one's best guarantee of success, seems to serve only narrow interests at the wider society's expense. That non-competition covenants still exist and are so widely applied brings to mind Oliver Wendell Holmes's maxim that

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and [*330] the rule simply persists from blind imitation of the past. n19

A non-competition covenant is a term in an employment contract that forbids the employee from joining a competitive business within a specified amount of time after leaving the current employer. It is, in short, a post-employment prohibition that bars the employee from what may be his or her most productive use of skills, knowledge, and experience. Noncompetition clauses are almost always boilerplate form contracts, and job applicants usually have little or no ability to negotiate their terms. Twelve months is, in our experience, the most common time period listed in such covenants.

Historically, courts limited the application of non-competition covenants to specific regions, and have consistently refused to apply covenants that seek to impose multi-year limitations. Courts have also struck down blatant attempts to vest ownership of a person's post-resignation inventions in the former employer. But these minor limitations matter little in today's economy, where businesses have nationwide operation, and where a one-year limit may force an employee to avoid joining a company where his or her skills will best be used, and where he or she may find the most favorable compensation. A one-year noncompetition covenant is a substantial limitation on a skilled employee looking to find the most productive and innovative position available, and on venture-backed enterprises seeking to hire the best available local talent.

We believe that if American courts were considering the imposition of non-competition covenants afresh, and without the weight of history, such covenants would be rejected for their unfairness, their impositions upon individuals' livelihoods, and their likely harm to the overall economy. As it stands, jurisdictions that affirm non-competition covenants are, in effect, applying the rules of a vastly different era to today's economy, without regard to whether doing so makes sense.

Indeed, it seems difficult to dispute the feudal, archaic nature of such covenants, and their origins in an age where laborers had few rights and innovation was not a major part of the economy. It appears that noncompetition covenants arose in England to protect local guild monopolies and, as the industrial age dawned, to regulate the labor market. n20 Non-competition [*331] clauses were just one of a universe of legal devices English law used by the late 1700s to restrict employee and apprentice mobility. n21 The sense one gets is that stronger parties and their judicial allies in England used the covenants and other measures to prevent competition and ensure that already-established businesses had an unfair advantage over newcomers and would-be market entrants. This imbalance of power is not surprising for that period of English history; the concept of the creative entrepreneur seems nascent at best. Blackstone himself defended a noncompetition restriction on the ground that an employee's labor is a form of property, owned by the employer. When describing a cause of action for enticing an employee away from his employer, he noted that:

> The reason and foundation upon which all this doctrine is built, seems to be the property that every man has in the service of his domestics; acquired by the contract of hiring, and vouchsafed by giving them wages. n22

The point of describing this somewhat embarrassing history is to highlight the origins of non-competition covenants in a vastly different time, one remote from the contemporary American economy. The very suggestion that an

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 5 of 16

Page 5
1 Entrepren. Bus. L.J. 323, *

employer has a property interest in its employees is offensive, but that may well have been the original justification for such contracts.

The problems with non-competition agreements are easy to understand. An inventive employee feels unproductive at a hierarchical, slow-moving company. He wants to start a new company to pursue new inventions. But his employer included a boilerplate non-competition covenant in his employment contract, and he is sidelined for a year from any activity that his employer might deem competitive. He must instead pursue a business less suited to his talents, or in which he has less experience. Waiting for one year means a wasted period, and few, if any, employees have the means to do nothing for a year before launching a competitive business. The former employer thus retains a monopoly in the field, or at least reduces the number of competitors.

 [*332] The problem worsens with the size and scope of the former employer's business. When giant multinational corporations with a wide range of business and research interests use broadly-worded noncompetition agreements to bind their skilled employees, the range of forbidden activities is theoretically enormous.

Microsoft is one example. n23 When an employee seeks to leave Microsoft to form an inventive new start-up, he or she probably has no idea of the full range of Microsoft's global research and inventive efforts. Should a former Microsoft employee in Washington State be bound not to compete with Microsoft if Microsoft employees in China or Europe held a brainstorming meeting and thought about research in the same area that the former employee wants to pursue in her own business? What if the employee sets out in a line of business that he believes is not competitive to Microsoft, only to find that the company in some remote office--unbeknownst to him--is working on the same idea? More to the point, what is one of the world's most powerful companies, and one once pursued by the U.S. government for antitrust violations, doing using noncompetition covenants to stop its employees from pursuing innovation outside the company, and why should the judiciary allow Microsoft to do so? n24

Our critique of non-competition covenants encompasses not just those that expressly bar competition for a certain period of time, but also those purportedly "narrow" covenants that extract a financial penalty to scare the employee away from future competition. n25 The range of such penalty clauses seems limitless; in extreme cases, some employers have even required employees to pledge that their employer will own anything they create for a set period of time after they resign. n26

We question the philosophical justification, if there is one, for a legal doctrine that favors one business over another merely because the first-in-time business forced its employees to sign away their right to [*333] compete. We see no principled reason why being the first to pursue an idea in a given jurisdiction should bar those who work for that first business from setting out to pursue the same general idea with a new and different enterprise. And while some argue that non-competition covenants prevent trade secret misappropriation, this is somewhat like arguing that the way to prevent traffic accidents is to prohibit automobiles. Punishing the entire class of would-be competitors to prevent a few from taking trade secrets is wildly overbroad and serves only those who seek to prevent even entirely lawful competition.

As noted above, California bars non-competition agreements outright, with two minor exceptions, n27 and some other states make such contracts difficult to enforce. n28 But most states permit non-competition covenants lasting one year or less. Ohio is one state that permits former employers to broadly restrict their former employees, n29 and we believe that such rules are a serious obstacle to the development of a venture-backed innovation community.

It is very likely that barring non-competition covenants--as California has done--would result in tangible economic benefits in addition to providing more freedoms for former employees. Two companies working on the same problem are more likely to result in the best possible solution. Consumers are more likely to find price benefits from increased competition. More companies working in a field are likely to spin off more ideas and inventions as they pursue their primary goals than one company is.

It should be obvious from our comments that we believe noncompetition agreements are an archaic holdover from a different and less open economic model--a time when large landowners and factory owners held all the power, and small innovative companies were not a prominent part of the economy. Legislative action to abolish non-competition agreements may be unlikely, though it is not out of the question. n30 [*334] Employees with bargaining power can refuse to sign them, intelligent business owners who recognize that the gains from employee mobility outweigh narrower concerns can refuse to apply them, and attorneys can mount new and creative challenges to these obsolete shackles on innovation.

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

Case 5:07-cv-05248-JW   Document 158-2   Filed 06/02/2008   Page 6 of 16

Page 6
1 Entrepren. Bus. L.J. 323, *

B. *Non-Solicitation Covenants*

Non-solicitation covenants are closely related to non-competition covenants and pose similar problems. Non-solicitation covenants are a more specific type of non-competition clause which typically bar (1) contacting any of the former employer's customers for a certain period of time, usually one year, and/or (2) hiring or attempting to hire a former co-worker, or even encouraging a former co-worker to change jobs, usually for one year.

Non-solicitation covenants are broader than trade secret restrictions because they prohibit a former employee from making contact with individuals regardless of whether the former employer claims those individuals' identities as trade secrets. In other words, even if a customer is not the former employer's trade secret, a non-solicitation covenant prevents a former employee from initiating contact with that non-secret customer for its business.

As to the non-solicitation of customers, such covenants are monopolistic and overreaching. What if the customer would prefer to do business with the former employee, or at least seek a competing price quote, but does not know that the former employee has resigned and started a new business? Something is amiss when consenting businesses cannot transact business together, merely because another business got there first. As with non-competition covenants generally, such contracts appear to restrict competitive activities that might lower prices, provide better services for customers, and allow businesses to partner together where that might be most productive.

As is so often the case, California has taken the lead in abolishing such contracts. A 2003 decision voided a non-solicitation clause to the extent it prevented a former employee from calling on non-secret customers of the former employer. n31

As to non-competition covenants that bar the solicitation of one's former co-workers, the restriction on innovation is apparent. Entrepreneurial start-up companies are often founded by groups of friends [*335] who have worked together elsewhere. If a company founder cannot contact his or her former co-workers--people whom he or she may work best with, and whose common efforts would be the most creative--the only beneficiary is the former employer. In many cases where employees would respond to an invitation to leave, the former employer is in decline, is too hierarchical, offers too little financial reward for employee-inventors, or its management simply treats employees badly. Covenants that prevent a friend from calling his or her former co-workers to solicit them for a better-paying, more rewarding opportunity in favor of an unproductive or slow-moving employer seem to have no rational basis other than sheer favoritism towards established businesses. n32 We believe that unless such solicitation is accomplished using some unlawful means, contracts that bar the contacting of one's former co-workers should be rejected.

C. *Preparing to Compete*

Another legal area where lessened restrictions may promote the growth of creative new companies is the law regarding a departing fiduciary's preparations to compete with his or her principal. Many start-up businesses are founded by individuals who were officers or directors at their previous jobs, and thus owed fiduciary duties. Fiduciaries, of course, owe greater duties than do ordinary employees. n33 The legal question is the degree to which a fiduciary can plan the next venture before actually resigning without violating his or her fiduciary obligations.

Unlike the law of non-competition agreements, the "preparing to compete" case law has largely been favorable for fiduciaries planning a new company before resigning. Although the cases are few and scattered, courts have held that fiduciaries may, before resigning, organize infrastructure for the next business, n34 file incorporation papers, n35 and seek financing. n36 They [*336] may also announce their plans to others, so long as they do not engage in solicitation. n37 The latter point can be dangerous, because fiduciaries planning to leave often develop the plan in discussions with friends from work. The law is not as well-developed as it should be regarding the differences between developing a plan with friends and issuing a solicitation to potential customers or other co-workers. At least one court has noted that the former is permissible, and we agree that it should be, including for fiduciaries. n38

The areas where fiduciaries get into trouble when planning new companies are predictable--inventing new technologies that relate to the employer's business, or making substantial use of company resources to [*337] work on the next business. n39 But like all employees, fiduciaries may re-use non-secret information after resigning. n40

Preparing to compete, then, is an area where the courts have been sympathetic to departing fiduciaries--a sympathy that promotes innovation. Courts need to be made aware of these favorable decisions so that a uniform set of rules can be developed to prevent overbroad or frivolous lawsuits against departing fiduciaries.

D. *Trade Secret Law: Rejecting "Inevitable Disclosure"*

Case 5:07-cv-05248-JW     Document 158-2     Filed 06/02/2008     Page 7 of 16

Page 7
1 Entrepren. Bus. L.J. 323, *

Trade secret law under the Uniform Trade Secret Act ("UTSA") offers a somewhat balanced approach to the use of nonpublic information by former employees, but trade secret law in practice is quite different from trade secret law on paper. It is the manner with which trade secret lawsuits are litigated, rather than the laws as written, that poses the greater threat to innovation communities. We have seen far too many start-ups targeted by a former employer and then harassed with overbroad and ever-changing sets of trade secret accusations--with little understanding or intervention by the courts overseeing the cases. We offer comments on three aspects of trade secret law in practice, then, to discuss how the law as practiced can impede innovation, and to offer arguments for litigators who defend inventive and mobile employees.

The single biggest threat to innovation under trade secret law is the so-called "inevitable disclosure" theory--a former employer's request for an injunction to stop a former employer from even working for a competitor, on the ground that trade secrets might be used. An "inevitable disclosure" injunction is a court-created, after-the-fact non-competition [*338] covenant that penalizes a former employee who has not actually misappropriated anything. Like written non-competition contracts, an "inevitable disclosure" injunction favors the first-in-time business over its new competitor.

We have seen how "inevitable disclosure" lawsuits operate. In all or most such cases, the former employer's attorneys find out that the employee has formed or joined a competitor, and then paint the former employee as a dishonest thief in public court papers. We have seen trade secret accusations based on information to which the former employee never even had access, or that the former employer had already placed in the public domain. In many cases the former employee simply sought a more desirable job, a better chance to invent, and greater compensation to support his or her family. In some cases the former employee has already moved to a different city or state to join the new employer, only to face a court proceeding that might sideline him or her. The result is uncertainty and fear at being defamed as a would-be misappropriator--something the former employer accomplishes without even having to present evidence of wrongdoing.

As with non-competition agreements, we believe that courts should reject the "inevitable disclosure" theory out of hand as an overbroad restriction. If a former employer has an opportunity to prevent an employee from competing without any evidence of wrongdoing, and can do so merely by hiring attorneys to attack the employee and file injunction papers, then the law disfavors innovation and employee mobility.

The theory has a long history dating back to 1897, n41 though the label "inevitable disclosure" appears to be a fairly recent development. California has long rejected the theory, n42 but a notorious Seventh Circuit decision in 1995 gave it new life elsewhere. n43 Courts continue to issue inconsistent rulings when faced with "inevitable disclosure" requests for injunctions. n44 We can only hope that courts will think carefully about the implications of such injunctions when ruling on them.

[*339] E. *Trade Secret Law: Skepticism Toward Alteration of Secrecy Claims*

A second and more general issue in trade secret law is the problem of overbroad and frequently-changing sets of trade secret claims. We see far too many trade secret lawsuits where the plaintiff--through indifference or as a deliberate tactic--buries its "real" trade secret claims in a wider set of concepts that are demonstrably non-secret. This forces the defendant, which is often a tiny start-up, to hire expensive experts to conduct research merely to reduce the overbreadth of the plaintiff's claims.

A related problem, and one that is a feature of most trade secret lawsuits, is the plaintiff's ability to alter its trade secret claims with ease, so that the defendant is forever fighting a moving target. We have seen cases where the defendant is able to rebut the original set of claims, and the plaintiff then changes course and alleges a second, completely different set of trade secret claims. In one case, the plaintiff switched from customer list-based claims to technology claims, and in another the plaintiff switched from hardware-based trade secret claims to software-based claims. In both cases, the defendant spent time and money to show the weaknesses in the first set of claims, and then had to start over again. In both cases, the plaintiff was a powerful and well-established company, and the defendant was a small, venture-backed start-up.

We believe these problems occur because courts do not recognize that plaintiff's trade secret claims are too often created after the fact by attorneys to try to trap a former employee, and not so valuable that the plaintiff had previously recorded them as company intellectual property and guarded them as secret before the employee departed. Courts should recognize that trade secret claims--the only form of intellectual property that is not written down and registered with the government in advance, unlike copyrights, trademarks, or patents--are too easily manipulated by those seeking to restrict lawful competition.

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 8 of 16

Page 8
1 Entrepren. Bus. L.J. 323, *

There are two things courts can do (and that litigators can ask courts to do) to address this problem. One is concrete, and one is abstract. First, courts should follow the lead of a recent California court and require that trade secret plaintiffs show "good cause" to add new trade secret claims mid-stream. n45 Trade secret plaintiffs should not be permitted to freely alter and add claims, especially once discovery is nearing its close.

Second, courts can better express skepticism towards trade secrecy claims by recognizing that trade secrets are intellectual property rights that [*340] extend only so far as the property right, rather than semi-feudal obligations that attach to an employee even if the trade secret claims are weak. Some view trade secret law as a set of obligations by a former employee to avoid using any information learned from a former employer. The property-based approach, by contrast, allows the former employee to defeat the claim by defeating the property right--such as by demonstrating that the information is known to the trade and thus free for him or her to use.

In short, we believe that recognizing that former employers often make overbroad trade secret claims and alter them frequently as an anticompetitive tactic is important when developing legal practices that favor the growth of creative enterprises.

F. *Trade Secret Law: Procedural Requirements*

We turn to three procedural issues as a final critique of trade secret practices that restrict innovation: (1) whether a trade secret plaintiff must actually spell out its trade secret claims in detail so that courts and the defendant know what is at issue; (2) whether the forty-plus jurisdictions under the Uniform Trade Secret Act should use that statute to preempt obsolete common law claims aimed at departing employees; and (3) whether trade secret plaintiffs should be able to use litigation protective orders to prevent the accused defendant from learning what information he or she is accused of already knowing and stealing.

As to the identification of trade secret claims, the problem is that trade secret plaintiffs often seek to avoid disclosing the details of the alleged trade secrets to prevent the defendant from raising the best possible defenses. A defendant who does not know the exact details of the claims cannot always point to public domain sources, prove independent derivation, or prove his or her preexisting knowledge of the alleged secret. In turn, a court cannot make an educated ruling on summary judgment if it does not know what the claims are.

California is the only state with a statute that requires a trade secret plaintiff to provide some identification of its claims before initiating discovery. But even under that statute, a plaintiff need not provide an absolutely specific identification of the alleged secrets, and thus the defendant must seek a complete identification through interrogatories. n46 Some other jurisdictions require identification early in the case, and many [*341] now require identification as the case progresses. n47 But few courts demand the exact precision necessary to accurately assess a plaintiffs claim against information in the public domain, and few courts seem to recognize the gamesmanship involved in withholding a complete identification. One recent exception was a Seventh Circuit decision that criticized a plaintiff's failed identification of software trade secret claims in sharp language. n48 We believe that trade secret litigators should educate courts on the reasons why a complete and specific identification is necessary, and sooner rather than later.

As to preemption of common law claims under the Uniform Trade Secret Act, the problem is that trade secret plaintiffs often seek to evade the defense-friendly aspects of the statute by pleading trade secret claims under alternative labels such as unfair competition, conversion, and tortious interference. For the most part, courts have barred such claims under the UTSA's preemption clause. n49 Some trade secret plaintiffs, however, have been able to fool a small minority of courts that there is such a category as information that is confidential but that does not rise to the level of a trade secret. n50 This tactic is mere wordplay, an attempt to avoid the statute by [*342] using a synonym like "confidential" or "proprietary" instead of the phrase "trade secret," or to sue over information that is not secret but that the former employer nonetheless seeks to prevent an employee from using. We believe that courts should follow the reasoned decisions and recognize this subjective labeling tactic for what it is, and reject it under the UTSA's preemption clause. n51 In a UTSA jurisdiction, all tort claims alleging misuse of nonpublic commercial information should be litigated exclusively under the statute.

As to allowing a defendant to see the information he or she is accused of taking, the problem is that even when a trade secret plaintiff identifies the alleged secrets, it typically does so under an "attorneys' eyes only" protective order. The accused wrongdoer is thus prohibited from reviewing the information he or she is accused of already knowing and taking. This prevents the person best able to refute the accusations from doing so, such as by pointing out known public domain sources or establishing his or her prior knowledge of the information before joining the former employer.

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 9 of 16

Page 9
1 Entrepren. Bus. L.J. 323, *

Litigators should insert language into protective orders to allow for the accused wrongdoer's access to the list of alleged secrets, and should move to compel such access if the plaintiff refuses. Trade secret plaintiffs sometimes try to defend such restrictions by claiming that the defendant will take the information, but such an argument makes little sense given that the defendant is *already* being accused of taking and using the exact same information.

Procedural reforms in trade secret law may be as important as abolishing non-competition covenants in promoting the development of innovation communities. Trade secret litigation can be a dangerously [*343] anticompetitive weapon in the hands of a former employer willing to allege anything and change those allegations frequently in a race to spend a smaller competitor into the ground.

IV. TEN QUESTIONS FOR FURTHER SCHOLARLY RESEARCH AND DEBATE

We are confident that an overly-restrictive employee mobility regime inhibits the development of venture-backed innovation communities. But every theory should be rigorously debated and tested. To that end, and in the spirit of developing more meaningful data from which conclusions could be drawn, we will describe ten questions where scholarly research would be useful. These questions are as follows:

(1) In jurisdictions where non-competition covenants are legal, what percentage of high-tech businesses actually include them in employment contracts?
(2) In jurisdictions where non-competition covenants are legal, and where skilled employees are subject to them, to what degree are such employees forced to change fields when they change jobs to avoid a lawsuit? Do such field changes make less productive use of those employees' skills, knowledge, and experience?
(3) In jurisdictions where non-competition covenants are legal, how often do former employers seek to enforce them, and do they represent a profit source for law firms which advocate their continued existence? What is the cost of litigation over such covenants to newly-formed businesses?
(4) In jurisdictions where non-solicitation covenants bar former employees from contacting the customers of their former employers for such period of time, are such customers aware that their choices have been limited by the former employer? Are the former employers who use such covenants able to charge more to such customers as a result of less competition?
(5) When departing employees and/or fiduciaries prepare to compete, do they typically meet with potential sources of venture funding before resigning, or afterwards? If the former, does the law of each state permit such activities, and if not, on what basis?
(6) When former employers sue their former employees, venture capital firms are sometimes added as a defendant. How frequent are such lawsuits, how successful are claims against venture capital firms, and what defenses have venture firms used to defeat such claims?
(7) How frequent is trade secret and non-competition litigation in different jurisdictions? How much money is spent on lawyers in such cases versus the approximate economic value of the allegedly secret information?
(8) How many states require trade secret plaintiffs to provide a detailed identification of the alleged trade secrets early in the case? How many allow plaintiffs to avoid such identification, and for how long? Are defendants in such cases prevented from raising defenses such as [*344] preexisting knowledge or nonsecrecy because they lack the details of each claim?
(9) How frequently do American technology companies actually track and record information they consider to be trade secrets? What percentage of trade secret lawsuits feature claims based on such information, as opposed to claims drafted by lawyers after the fact to target a former employee?
(10) Do California companies provide less job training than do companies in jurisdictions that permit non-competition covenants? If not, is there any validity to the belief that non-competition agreements allow for better or more job training?

We believe that further research in these areas could shed light on the hypotheses advanced by Professor Gilson, by this Article, and by other thinkers questioning the current intellectual property regime. If we are to develop new legal rules that best fit contemporary economic problems, assertions should be tested and hypotheses should be challenged. Already too much law is created by lawyers serving narrow interests and lacking a broader perspective informed by scholarly attention.

V. CONCLUSION

What we propose for trade secret and non-competition law is that courts should critically examine whether rules created in different eras truly serve to protect inventors and benefit the economy, or whether they instead operate pri-

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

Case 5:07-cv-05248-JW     Document 158-2     Filed 06/02/2008     Page 10 of 16

Page 10
1 Entrepren. Bus. L.J. 323, *

marily to restrict competition by former employees for no reason other than to favor their former employers' particular interests.

Non-competition covenants are a leftover from a different time, and are inconsistent with the rights of former employees to follow their interests and the development of innovative companies. Trade secret law all too often permits former employers to pursue after-the-fact, unwritten noncompetition contracts and to bury a start-up rival in litigation costs. We believe that the law is an important factor affecting the growth of innovation communities, and that substantial change is needed in the noncompetition and trade secret jurisprudence of almost every state.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawTypes of ContractsCovenantsGovernmentsLegislationOverbreadthTrade Secrets LawOwnership RightsCovenants Not to Compete

**FOOTNOTES:**

n1 Professor Lawrence Lessig summarizes this mythology for patents: "If an inventor can't get a patent, then he will have less incentive to invent. Without a patent, his idea could simply be taken If people could so easily free-ride, fewer would be inventors. And if fewer were inventors, we would have less progress in 'science and useful arts.'" LAWRENCE LESSIG, THE FUTURE OF IDEAS 205 (Vintage Books 2002). Whether or not this holds true for patent law, we believe it certainly does not for overly restrictive trade secret and employee mobility laws.

n2 For a summary of various conceptions of the "public domain" offered by different commentators in these debates, *see generally* Pamela Samuelson, *Enriching Discourse on Public Domains,* 55 DUKE L. J. 783 (2006). For our purposes here, the "public domain" means information a former employee can freely use after departing.

n3 *See* Lisa Lerer,*'DotCommunist' Protects Free Software Frontier,* THE RECORDER, Feb. 21, 2006, at 3 (profile of Moglen describing his call for the "abolition of all intellectual property laws" and his promotion of free software projects).

n4 *See* Catherine L. Fisk, *Knowledge Work: New Metaphors for the New Economy,* 80 CHI.-KENT L. REV. 839, 862-63 (2005) (calling for the replacement of current invention assignment rules with a system that gives employee-inventors a credit in the form of a sort of joint ownership).

n5 *See* ANNALEE SAXENIAN, REGIONAL ADVANTAGE: CULTURE AND COMPETITION IN SILICON VALLEY AND ROUTE 128, 31-37, 41, 60-78 (Harvard Univ. Press 1996) (examining differences between Silicon Valley and Boston's Route 128, including the freer flow of information); Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants not to Compete,* 74 N.Y.U. L. REV. 575, 594-619 (1999) (attributing Silicon Valley's relative success to a less restrictive trade secret and employee mobility legal regime).

n6 *See* Gilson, *supra* note 5, at 607-09 (discussing CAL. BUS. & PROF. CODE § 16600).

n7 *See id.* at 621. Another scholar has published a detailed study indicating that information is widely disseminated among Silicon Valley employees, regardless of trade secret laws. *See* Yuval Feldman, *Experimental Approach to the Study of Normative Failures: Divulging of Trade Secrets by Silicon Valley Employees,* 2003 U. ILL. J.L. TECH. & POL'Y 105.

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

1 Entrepren. Bus. L.J. 323, *

n8 *See* Gilson, *supra* note 5.

n9 *See* Kristina L. Carey, *Beyond the Route 128 Paradigm: Emerging Legal Alternatives to the Non-Compete Agreement and Their Potential Effect on Developing High-Technology Markets,* 5 J. SMALL & EMERGING BUS. L. 135 (2001) (noting various legal theories used to limit employee mobility in West Coast high-tech regions).

n10 *See* Fisk, *supra* note 4, at 857 ("Virtually every observer from every possible perspective agrees that changes in the economy of industrial and post-industrial nations and the world as a whole have increased the importance of intellectual capital... Compared to fifty years ago, even those who still sell or manufacture things (as opposed to knowledge) spend a greater proportion of dollars per unit of output on knowledge than they do on raw materials or labor.").

n11 *See* Jason S. Wood, *A Comparison of the Enforceability of Covenants not to Compete and Recent Economic Histories of Four High Technology Regions,* 5 VA. J.L. & TECH. 14 (2000), *available at* http://www.vjolt.net/vol5/issue3/v5i3al4-Wood.html.

n12 *See id.*

n13 *See id.* (noting that during the boom time at issue, highly-skilled employees had greater bargaining power with prospective employers, which could explain why some employers choose not to use non-competition covenants).

n14 *See* Dan Seligman, *The Case for Servitude,* FORBES MAGAZINE, March 1, 2004, at 70.

n15 *See id.* We contacted the Hoover Institution scholar quoted in the article, David Henderson, soon after the article appeared to find out about any economic studies justifying noncompete covenants. To our knowledge, it does not appear that any such studies exist.

n16 *See* David D. Friedman, William M. Landes, and Richard A. Posner, *Some Economics of Trade Secret Law,* 5 J. ECON. PERSP. 61, 69-70 (1991).

n17 *See* Ann C. Hodges & Porcher L. Taylor III, *The Business Fallout from the Rapid Obsolescence and Planned Obsolescence of High-Tech Product: Downsizing of Noncompetition Agreements,* 6 COLUM. SCI. & TECH. L. REV. 3 (2005), *available at* http://www.stlr.org/cite.cgi?volume=6&article=3.

n18 It may well be that widespread employee mobility is a feature of any period of innovation and growth in technological development, anywhere in the world. *See, e.g.,* Don Lee, *Job Hopping is Rampant as China's Economy Chases Skilled Workers,* LOS ANGELES TIMES, Feb. 21, 2006, at C1 (describing widespread employee mobility in China's dynamic economic sectors).

n19 Oliver Wendell Holmes, *The Path of the Law,* 10 HARV. L. REV 457, 469 (1897) (referring to an archaic aspect of real property law) (*reprinted at* http://www.41awschool.com/lib/pathoflaw.shtml).

n20 *See* Harlan M. Blake, *Employee Agreements Not to Compete,* 73 HARV. L. REV. 625, 629-37 (1960) (describing early English case law and development of non-competition agreements, which were based on protecting guilds and later on regulating the labor market); KAREN ORREN, BELATED FEUDALISM: LABOR, THE LAW, AND LIBERAL DEVELOPMENT IN THE UNITED STATES 71-76, 104-05 (Cambridge Univ. Press 1992) (describing the medieval hierarchy of labor in feudal England and its transmission into nineteenth century, early industrial American law through non-competition covenants and other restrictions; "'the hierarchical relation of master and servant in nineteenth-century America was a remnant of the larger system of hierarchies that historically had extended up and down medieval society.").

n21 *See generally* ADAM SMITH, THE WEALTH OF NATIONS 137-40 (Edwin Cannon ed., The Modern Library 1937) (1776) (discussing numerous then-existing restrictions on workers and apprentices).

n22 *See* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 417 (University of Chicago Press 1979) (1769).

n23 We have participated in advising several groups of individuals who sought to leave Microsoft and were bound by non-competition covenants. In each case, the employees faced the problem of not even knowing whether Microsoft might potentially be competitive in a certain technical area because the company is so far-flung.

n24 One Microsoft non-competition covenant dispute was widely reported in 2005. Kai-Fu Lee, a Microsoft employee bound by a non-competition clause, joined Google, and litigation resulted. *See* Ina Fried, *Microsoft Sues Over Google Hire,* CNET News, July 22, 2005, http://news.com.com/Microsoft+sues+over+Google+hire/2100-1014_3-5795051.html.

n25 For a well-known example struck down by a California court, *see* Muggill v. Reuben H. Donnelley Corp., 42 Cal. Rptr. 107, 108-09 (1965) (voiding clause that ended pension payments if former employee joined competitor under California law).

n26 *See* Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879, 895 (N.J. 1988) (refusing to apply holdover clause on reasonableness grounds); Armorlite Lens Co. v. Campbell, 340 F. Supp. 273, 275 (S.D. Cal. 1972) (voiding holdover invention assignment clause as an impermissible non-competition agreement under California law).

n27 *See* CAL. BUS. & PROF. CODE § 16601 (1997) (sale of the goodwill or corporate shares); CAL. BUS. & PROF. CODE § 16602 (1997) (partnership arrangements).

n28 *See, e.g.,* NCH Corp. v. Broyles, 749 F.2d 247, 251 (5th Cir. 1985) (finding non competition covenant void as a matter of Louisiana public policy).

n29 *See* UZ Eng. Prod. Co. v. Midwest Mtr. Supply Co., Inc., 770 N.E.2d 1068, 1080-81 (Ohio Ct. App. 2001) (upholding an overbroad, two-year non-competition and non-solicitation covenant to prevent competition in the "small parts" trade; court went so far as to assert that "an employer has a legitimate interest in preventing a for-

mer employee from using the *skill, experience, training,* and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless whether it was an already established customer of the former employer.") (emphasis added).

n30 It would seem that state legislators from both parties would be amenable to the abolition of non-competition clauses; support for intellectual property reform need not split down party lines. Promoting employee mobility both benefits employees, which may appeal more to Democrats, and helps promote entrepreneurial businesses, which may appeal more to Republicans. No doubt powerful companies which use noncompetition covenants would lobby against reform, but a principled argument in defense of non-competition contracts seems difficult to muster.

n31 *See* Thompson v. Impaxx, Inc., 7 Cal. Rptr. 3d. 427, 429-32 (Cal. Ct. App. 2003) (voiding customer non-solicitation clause in employment contract to the extent it barred contacts with non-secret customers).

n32 Recent cases involving co-worker non-solicitation covenants include Hay Group, Inc. v. Bassick, No. 02 C 8194, 2005 WL 2420415, at *7 (N.D. Ill. Sept. 29, 2005) (striking down covenant as overbroad given plaintiff's global business); Palmer & Cay v. Lockton Cos., Inc., 615 S.E.2d 752, 756 (Ga. Ct. App. 2005) (upholding covenant).

n33 There generally is no restriction, for example, on groups of employees getting together before resignation to make a plan to leave and form a new company. *See, e.g.,* ATC Distr. Group, Inc. v. Whatever it Takes Transmissions & Parts, Inc., 402 F.3d 700, 716 (6th Cir. 2005) ("[Plaintiff] offers no explanation why ordinary employees of a company may not meet with each other, openly or 'clandestinely,' to plan for the opening of a rival company for which they would rather work."); The Fitness Experience, Inc. v. TFC Fitness Equip, Inc., 355 F. Supp. 2d 877, 892-93 (N.D. Ohio 2004) (granting summary judgment in favor of employees who had made preparations to compete before resigning by making plans, meeting with "insurance agents, realtors, and lawyers," and possibly a de minimis use of a company phone). The more difficult question involves a fiduciary's latitude to engage in similar pre-resignation activities.

n34 *See* Midwest Janitorial Supply Corp. v. Greenwood, 629 N.W.2d 371, 374-75 (Iowa 2001) (permissible preparation activities included contacting a realtor about warehouse space, looking into phone system pricing, arranging for signs, and looking into computer hardware); Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 234-35 (D.D.C. 1996); Dwyer, Costello and Knox, P.C. v. Diak, 846 S.W.2d 742, 747 (Mo. Ct. App. 1993) (permissible to rent office space and print stationary before resigning); Maryland Metals, Inc. v. Metzner, 382 A.2d 564, 570-71 (Md. Ct. App. 1978) (permissible to consult with a state business commission, file a bank application for a loan to purchase equipment, contact the power company regarding power for the equipment, and sign a contract to purchase important equipment).

n35 *See* Instrument Repair Serv., Inc. v. Gunby, 518 S.E.2d 161, 163 (Ga. Ct. App. 1999) (permissible to incorporate new competitive business before resignation); Venture Express, Inc. v. Zilly, 973 S.W.2d 602, 606 n.2 (Tenn. Ct. App. 1998) (same); Fletcher, Barnhardt & White, Inc. v. Matthews, 397 S.E.2d 81, 84 (N.C. Ct. App. 1990) (initial steps to form new company before resignation permitted); Zemitzsch, Inc. v. Harrison, 712 S.W.2d 418, 422 (Mo. Ct. App. 1986) (permissible to incorporate new company before resigning); Parsons Mobile Prods., Inc. v. Remmert, 531 P.2d 428, 432-33 (Kan. 1975) (same).

n36 *See* Greenwood, 629 N.W.2d at 374-75 (permissible to seek line of credit for next company); *Maryland Metals,* 382 A.2d at 570-71 (permissible to contact a potential investor in next company).

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

Case 5:07-cv-05248-JW    Document 158-2    Filed 06/02/2008    Page 14 of 16

Page 14
1 Entrepren. Bus. L.J. 323, *

n37 *See* The New L&N Sales & Mktg., Inc. v. Menaged, No. CIV.A.97 4966, 1998 WL 575270, at *7 (E.D. Pa. Sept. 9, 1998) (permissible to schedule an appointment with a customer for a date after the fiduciary's resignation); *Wilde,* 920 F. Supp. at 235 (permissible to invite other employees to a dinner to solicit them where the date of the invitation was set for a date after resignation); McCallister Co. v. Kastella, 825 P.2d 980, 983-84 (Ariz. Ct. App. 1992) (permissible to give 30 days' notice and send a letter to the employer's customers announcing the resignation); Dworkin v. Blumenthal, 551 A.2d 947, 949 (Md. Ct. App. 1989) (permissible to use non-secret patient list before leaving, give notice, and send letters to patients before resignation); Harrison, 712 S.W.2d at 422 (permissible to tell employer's customer before resignation of plan to form new company); Ellis & Marshall Assoc, Inc. v. Marshall, 306 N.E.2d 712, 717 (Ill. Ct. App. 1974) (permissible to inform coworkers and employer's customers of plan to resign and form competing entity).

n38 *See* Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 510-13 (Tex. Ct. App. 2003) ("The employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer.") (affirming jury verdict of no solicitation where, among other things, other employees initiated contact with defendant).

n39 Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1265 (D.D.C. 1997) (impermissible to use secret information and, before resigning, to solicit coworkers). *See* Golden Eagle/Satellite Archery, Inc. v. Epling, 665 N.Y.S.2d 169, 170 (N.Y. App. 1997) (impermissible to use company resources to develop product for which defendant later sought patent); Daniel Orifice Co. v. Whalen, 18 Cal. Rptr. 659, 665-67 (Cal. Ct. App. 1962) (impermissible to create detailed specifications of improvements to the plaintiff's product during off-hours, and to resign and sell the ideas through a new company). *See* Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consultants, Inc., 756 F. Supp. 1408, 1413 (D. Or. 1991) (impermissible to make extensive use of company time and resources to organize a new company).

n40 *See* Caddy-Imler Creations, Inc. v. Caddy, 299 F.2d 79, 83 (9th Cir. 1962) (fiduciary created list of potential customers from public sources in plaintiff's service, and then re created the list from same sources after resignation); *see also* Numed, Inc. v. McNutt, 724 S.W.2d 432, 435 (Tex. App. 1987) (permissible to use non-secret information learned from the former principal for next venture); Public Relations Aids, Inc. v. Wagner, 324 N.Y.S.2d 920, 923 (N.Y. App. 1971) (former fiduciary permitted to use information that was "ingenious" but non-secret); J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 731 (Mass. App. 1970) (being a former fiduciary "did not make information, otherwise properly acquired, confidential.").

n41 *See* Catherine Fisk, *Working Knowledge: Trade Secrets, Restrictive Covenants in Employment, and the Rise of Corporate Intellectual Property, 1800-1920,* 52 HASTINGS L.J. 441, 507 (2001) (noting origins of the "inevitable disclosure" theory in the late nineteenth century and citing decisions such as *O. & W. Thum Co. v. Tloczynski,* 72 N.W. 140 (Mich. 1897)).

n42 *See* Cont'l Car-Na-Var Corp. v. Moseley, 148 P.2d 9, 11 (Cal. 1944) (early case rejecting theory before it was called "inevitable disclosure"); Whyte v. Schlage Lock Co., 125 Cal. Rptr. 2d. 277, 291 (Cal. Ct. App. 2002) (rejecting "inevitable disclosure" under California law).

n43 *See* PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995).

n44 *See* Dexxon Digital Storage, Inc. v. Haenszel, 832 N.E.2d 62, 68-69 (Ohio Ct. App. 2005) (mechanically applying theory without any discussion of its merits); Liebert Corp. v. Mazur, 827 N.E.2d 909, 927-29 (Ill. Ct.

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

Case 5:07-cv-05248-JW   Document 158-2   Filed 06/02/2008   Page 15 of 16

Page 15
1 Entrepren. Bus. L.J. 323, *

App. 2005) (applying theory, but on evidence that defendant had actually taken secret material); LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 476 (Md. App. 2004) ("inevitable disclosure" not the law in Maryland).

n45 *See* Neothermia Corp. v. Rubicor Med., Inc., 345 F. Supp. 2d 1042, 1045 (N.D. Cal. 2004) (requiring good cause to amend trade secret claim identification under California statute).

n46 *See* Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 906-07 (2005) (interpreting California identification statute).

n47 *See, e.g.,* Analog Devices, Inc. v. Michalski, 579 S.E.2d 449, 454 (N.C. Ct. App. 2003) (no injunction where plaintiff listed non-secret general categories and pointed to documents: "Analog invites this Court to acknowledge the existence of trade secrets in the submitted information without bearing the burden of identifying those trade secrets. We will not read into Analog's claims specific identification of devices worthy of trade secret protection when it is Analog's burden to come forward with evidence of such devices."); Motorola, Inc. v. DBTEL, Inc., 2002 WL 1610982, *16 (N.D. Ill. 2002) (plaintiff failed to identify exact alleged secrets and instead just described generic categories of technical information); Porous Media Corp. v. Midland Brake Inc., 187 F.R.D. 598, 600 (D. Minn. 1999) (general categories of ideas related to brake canister product such as "detailed drawings of a new Porous canister" insufficient to permit discovery to go forward).

n48 *See* IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 583-84 (7th Cir. 2002) (plaintiff claimed that a forty-three page description of "methods and processes" in its software was enough; court held "No, it isn't," asked "Which aspects are known to the trade, and which are not?" and noted that "unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job.").

n49 A few of the multitude of recent cases ruling in favor of UTSA preemption are Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025, 1034-35 (N.D. Cal. 2005) (California law); Acrymed, Inc. v. Convatec, 317 F. Supp. 2d 1204, 1217-18 (D.Or. 2004) (Oregon law); Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999) (Ohio law).

n50 *See, e.g.,* McKesson Med.-Surgical, Inc. v. Micro Bio-Medics, Inc., 266 F. Supp. 2d 590, 600 (E.D. Mich. 2003) (Michigan law, finding breach of loyalty claim not preempted on theory that UTSA does not preempt "other confidential information" that is not a trade secret; later federal court rulings in Michigan have applied UTSA preemption broadly); Custom Teleconnect, Inc. v. International Tele-Serv., Inc., 254 F. Supp. 2d 1173 (D. Nev. 2003) (Nevada UTSA); Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652 (E.D. Va. 2002) (Virginia UTSA). The Wisconsin Supreme Court accepted the minority position in a recent decision over a strong dissent, and without analyzing any of the concerns described above. *See generally* Burbank Grease Serv., LLC v. Sokolowski, 717 N.W.2d 781 (Wisc. 2006). This ruling - which guts the UTSA's preemption clause and makes evading the statute a simple matter of calling information "confidential" instead of "trade secret" - may be one of the most badly reasoned trade secret cases in American history. The New Hampshire Supreme Court rejected the Wisconsin approach soon afterwards, and followed the majority approach. *See generally* Mortgage Specialists, Inc. v. Davey, No. 2005-067, 2006 WL 2060395 (N.H. July 26, 2006).

n51 *See, e.g.,* Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., Inc., 270 F. Supp. 2d 943, 947-49 (W.D. Mich. 2003) (collecting cases and disagreeing with *Stone Castle*).; Auto Channel, Inc. v. Speedvision Network, LLC, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001) (explaining why UTSA preemption covers alternative claims); Thomas & Berts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 972 (N.D. Ill. 2000) ("[Plaintiff] also argues that preemption is improper because the confidential information taken by [defendant] may not rise to the level of a trade secret. However, this theory would render [the UTSA's preemption clause] meaningless ...."); Weins v.

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims

1 Entrepren. Bus. L.J. 323, *

Sporleder, 605 N.W.2d 488, 491-92 (S.D. 2000) ("In analyzing claims for the purpose of applying the displacement provision, the issue is not what label the plaintiff puts on their claims. Rather, the court is to look beyond the label to the facts being asserted in support of the claims.").

ATTACHMENT A
AMEC China's and AMEC Asia's Opposition to Applied's Motion to Dismiss their Counterclaims